[No. C059079. Third Dist. Oct. 29, 2010.]

EQUILON ENTERPRISES LLC, Plaintiff and Appellant, v.
BOARD OF EQUILIZATION et al., Defendants and Respondents;
NATIONAL PAINT & COATINGS ASSOCIATION, INC., Intervener and
Respondent.

**COUNSEL**

Somach Simmons & Dunn, Stuart L. Somach, Daniel Kelly and Brian D. Poulsen, Jr., for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Paul D. Gifford, Assistant Attorney General, William L. Carter, Molly K. Mosley and Robert E. Asperger, Deputy Attorneys General, for Defendants and Respondents.

Winston & Strawn, Robert A. Julian and Susan E. Lee for Intervener and Respondent.

## Opinion

**ROBIE, J.**—In this tax refund case, plaintiff Equilon Enterprises LLC, doing business as Shell Oil Products US (Shell), sought a refund of $3,910,359.10 it paid for the year 2002 pursuant to regulations promulgated under the Childhood Lead Poisoning Prevention Act of 1991 (Health & Saf. Code, § 105275 et seq.), on the theory (among others) that the amount was an unconstitutional tax under section 3 of Proposition 13 (Cal. Const., art. XIII A, § 3). The trial court entered judgment against Shell and in favor of defendants Board of Equalization (the board) and State Department of Health Services (now the State Department of Public Health) (the department), concluding the fee Shell paid was a legitimate regulatory fee and not a tax.

On appeal, Shell contends the fee imposed on the gasoline industry under the department's regulations, which require the industry to bear approximately 85 percent of the costs of the childhood lead poisoning prevention program (lead program),[1] is an unconstitutional tax because it does not bear a reasonable relationship to the industry's responsibility for cases of childhood lead poisoning in California. According to Shell, the paint industry is mainly responsible for childhood lead poisoning but is allocated only 15 percent of the lead program's costs, and other industries "likely" responsible for childhood lead poisoning pay no lead program fee at all.

The lynchpin of Shell's argument is that for the fee to be constitutional, it must be proportional to the gasoline industry's responsibility for cases of *childhood lead poisoning*, rather than proportional to the industry's responsibility for *environmental lead contamination*. We disagree. A regulatory fee is not an unconstitutional tax under Proposition 13 if there is a reasonable basis in the record for the manner in which the fee is allocated among those responsible for paying it. Here, there was a reasonable basis for the department to allocate the lead program fee in the manner it did, based on the gasoline industry's responsibility for contaminating the environment with lead. The department was not obligated to allocate the fee based on responsibility only for those specific instances in which exposure to environmental lead contamination has actually resulted in childhood lead poisoning.

Because we reject this argument, as well as Shell's other two arguments, we will affirm the judgment.

---

[1] We will sometimes refer to the program as the lead program and to the fee that supports it as the lead program fee.

## FACTUAL AND PROCEDURAL BACKGROUND

Proper understanding of the issues in this case requires a detailed summary of the legislation underlying the fee regulations Shell has challenged. Accordingly, we begin by summarizing the legislation relating to the prevention of childhood lead poisoning, then we review the fee regulations, and then we turn to Shell's lawsuit.

A

### The 1986 Act

In 1986, the Legislature first enacted the Childhood Lead Poisoning Prevention Act (now codified as Health & Saf. Code, § 124125 et seq.) (the 1986 Act).[2] (Stats. 1986, ch. 481, § 2, pp. 1794–1795.) In doing so, the Legislature found and declared "that childhood lead exposure represents the most significant childhood environmental health problem in the state today; that too little is known about the prevalence, long-term health care costs, severity, and location of these problems in California; that it is well known that the environment is widely contaminated with lead; that excessive lead exposure causes acute and chronic damage to a child's renal system, red blood cells, and developing brain and nervous system; that at least one in every 25 children in the nation has an elevated blood lead level; and that the cost to society of neglecting this problem may be enormous." (§ 124125.)

The Legislature further found and declared "that knowledge about where and to what extent harmful childhood lead exposures are occurring in the state could lead to the prevention of these exposures, and to the betterment of the health of California's future citizens." (§ 124125.)

In enacting the 1986 Act, the Legislature's stated intent was "to establish a state Childhood Lead Poisoning Prevention Program within the Department to accomplish all the following: [¶] (a) [t]o compile information concerning the prevalence, causes, and geographic occurrence of high childhood blood lead levels[;] [¶] (b) [t]o identify and target areas of the state where childhood lead exposures are especially significant[;] [¶] [and] (c) [t]o analyze information collected pursuant to this article and, where indicated, design and

---

[2] The 1986 Act was originally codified as Health and Safety Code former section 309.7 et seq. (Stats. 1986, ch. 481, § 2, p. 1794), but in 1995, as part of a reorganization of that code, the Legislature repealed those sections (Stats. 1995, ch. 415, § 40, p. 3330) and reenacted the 1991 Act as Health and Safety Code sections 124125 et seq. (Stats. 1995, ch. 415, § 8, pp. 3102, 3159–3165).

Hereafter, all section references are to the Health and Safety Code unless otherwise noted.

implement a program of medical followup and environmental abatement and followup that will reduce the incidence of excessive childhood lead exposures in California." (§ 124125.)

Consistent with this intent, the 1986 Act directed the department to gather information about "each detected case of a blood level greater than 25 micrograms of lead per deciliter of human blood," "identify target areas in which to conduct a childhood lead screening program," "complete [the] screening program" "[b]y October 1, 1988," and "submit a report" "[o]n January 1, 1989" "describing the results of the screening program, the significance of the results, and the department's recommendations for further actions, where indicated." (Stats. 1986, ch. 481, § 2, pp. 1794–1795.) The Legislature appropriated $175,000 to provide first-year funding to implement the lead program and stated its intent that future funding for the program would be appropriated through the annual budget process. (*Id.*, § 3, pp. 1795–1796.)

B

*The 1989 Act*

The department apparently complied with the directive to submit a report on its activities under the lead program at the beginning of 1989, because later that year the Legislature enacted further legislation relating to the program (§§ 124150, 124160, 124165) (the 1989 Act).[3] (Stats. 1989, ch. 1455, p. 6491.) The Legislature found and declared that the information the department had gathered and the screening program had "confirmed and supported" the Legislature's findings in the 1986 Act relating to childhood lead exposure and had resulted in additional findings that "[v]ery few children are currently tested for elevated blood lead levels in California"; "[a]dditional blood lead screening needs to be done to identify children at high risk of lead poisoning"; "[b]ased on emerging information about the severe deleterious [e]ffects of low levels of lead on children's health, the lead danger level is expected to be lowered from 25 to 15 micrograms of lead per deciliter of human blood"; and "[l]ead poisoning poses a serious health threat for significant numbers of California children." (Stats. 1989, ch. 1455, § 1, pp. 6491–6492; see also § 124150.)

Based on these findings, the Legislature mandated that the department "direct the Childhood Lead Poisoning Prevention Program to implement a

---

[3] The 1989 Act was originally codified as part of the Childhood Lead Poisoning Prevention Act, sections 309.75 through 309.77 (Stats. 1989, ch. 1455, §§ 1–3, pp. 6491–6493), but with the reorganization of the Health and Safety Code in 1995, the 1989 Act was recodified as sections 124150, 124160, and 124165. (Stats. 1995, ch. 415, § 8, pp. 3102, 3160–3162.)

program to identify and conduct medical followup of high-risk children, and to establish procedures for environmental abatement and followup designed to reduce the incidence of excessive childhood lead exposures in California." (§ 124160.) These activities were to be completed by January 1, 1993. (*Ibid.*) After that date, the department, through the lead program, was to "continue to take steps that it determines are necessary to reduce the incidence of excessive childhood lead exposure in California." (§ 124165.)

The Legislature appropriated $140,000 to provide funding through June 30, 1990, and stated its intent "that the existing base funding for the Childhood Lead Poisoning Prevention Program shall be maintained, and that future additional funding to carry out the activities specified in [the 1989 Act] shall be appropriated through the annual budget process, commencing with the 1990–91 fiscal year budget." (Stats. 1989, ch. 1455, § 4, p. 6493.) Governor Deukmejian, however, deleted the appropriation because he determined it was "not necessary to put additional pressure on taxpayer funds for programs that fall beyond the priorities currently provided" and it would be "more appropriate to consider funding the provisions of this bill during the budget process," at which time "the relative merits of th[e] program [could be reviewed] in comparison to all other funding projects." (*Id.*, p. 6491.)

C

*The 1991 Act*

In 1991, the Legislature enacted the Childhood Lead Poisoning Prevention Act of 1991 (§ 105275 et seq.) (the 1991 Act).[4] (Stats. 1991, ch. 799, § 3, pp. 3559–3563.) In doing so, the Legislature noted that the department had "recently reported to the Legislature its findings and recommendations for the prevention of childhood lead poisoning in California." (*Id.*, § 1, p. 3558.) The department's findings included the following:

"(1) Because of differences in metabolism and excretion of lead, children are more vulnerable to lead toxicity than adults.

"(2) Exposure to even low levels of lead can result in brain damage and behavior problems that seriously impair a child's performance in school.

"(3) Severe lead poisoning can result in cerebral palsy, mental retardation, and loss of muscle control.

---

[4] The 1991 Act was originally codified as former section 372 et seq. (Stats. 1991, ch. 799, § 3, p. 3559), but in the 1995 reorganization of the Health and Safety Code the Legislature recodified the 1991 Act as section 105275 et seq. (Stats. 1995, ch. 415, § 5, pp. 2515, 2568–2572).

"(4) Ingestion of lead-contaminated dust and soil, lead-based paint chips, and water contaminated by lead solder in older plumbing continue to be sources of severe lead poisoning in children.

"(5) Lead in soil and dust is primarily derived from automobile exhaust from leaded gasoline, industrial emissions, and lead paint.

"(6) Although leaded gasoline use is declining, a large number of motor vehicles continue to use leaded gasoline. In addition, lead deposited in the environment from past leaded gasoline use persists in the environment.

"(7) Hand-to-mouth exposure is the primary cause of excessive lead accumulation in children. This exposure is exacerbated by the pronounced hand-to-mouth behavior of infants and toddlers." (Stats. 1991, ch. 799, § 1, p. 3558.)

Based on these findings, the Legislature declared the following four goals: (1) "to evaluate all children for risk of lead poisoning, to screen those children at risk, and to provide appropriate case management for lead-poisoned children"; (2) "to identify those sources of lead contamination that are responsible for lead-poisoned children so that the sources can be eliminated"; (3) "to identify and utilize existing programs to provide appropriate case management for children found to have lead poisoning, to the extent possible"; and (4) "to provide education on lead-poisoning detection and case management to health care providers throughout the state." (Stats. 1991, ch. 799, § 1, pp. 3558–3559.)

In a case we will discuss more fully later on, our Supreme Court summarized the relevant provisions of the 1991 Act as follows:

"The [1991] Act directs the Department to adopt regulations establishing a standard of care for evaluation, screening (i.e., measuring lead concentration in blood), and medically necessary follow-up services for children determined to be at risk of lead poisoning.[5] (§ 105285; see § 105280, subd. (e).) If a

---

[5] The 1991 Act defines "lead poisoning" as "the disease present when the concentration of lead in whole venous blood reaches or exceeds levels constituting a health risk, as specified in the most recent United States Centers for Disease Control guidelines for lead poisoning as determined by the department, or when the concentration of lead in whole venous blood reaches or exceeds levels constituting a health risk as determined by the department pursuant to Section 105300." (§ 105280, subd. (b).) The 1991 Act also provides, however, that the department's regulatory authority to implement and effectuate the purposes of the 1991 Act includes "[e]stablishment of lower concentrations of lead in whole blood than those specified by the United States Centers for Disease Control for the purpose of determining the existence of lead poisoning." (§ 105300, subd. (e).)

child is identified as being at risk of lead poisoning, the Department must ensure 'appropriate case management,' i.e., 'health care referrals, environmental assessments, and educational activities' needed to reduce the child's exposure to lead and its consequences. (§§ 105280, subd. (a), 105290.) Additionally, the [1991] Act requires the Department to collect data and report on the effectiveness of case management efforts. (§ 105295.)

"The Department has 'broad regulatory authority to fully implement and effectuate the purposes' of the [1991] Act. (§ 105300.) This authority 'include[s], but is not limited to,' the development of protocols for screening and for appropriate case management; the designation of laboratories qualified to analyze blood specimens for lead concentrations, and the monitoring of those laboratories for accuracy; the development of reporting procedures by laboratories; reimbursement for state-sponsored services related to screening and case management; establishment of lower lead concentrations in whole blood than those specified by the United States Centers for Disease Control for lead poisoning; notification to parents or guardians of the results of blood-lead testing and environmental assessment; and establishment of a periodicity schedule for evaluating childhood lead poisoning. (§ 105300.)

"The [1991] Act states that its program of evaluation, screening, and follow-up is supported *entirely* by fees collected under the [1991] Act: 'Notwithstanding the scope of activity mandated by this chapter, in no event shall this chapter be interpreted to require services necessitating expenditures in any fiscal year in excess of the fees, and earnings therefrom, collected pursuant to Section 105310. This chapter shall be implemented only to the extent fee revenues pursuant to Section 105310 are available for expenditure for purposes of this chapter.' (§ 105305.)

"Section 105310 imposes the fees at issue here. In pertinent part, that section imposes fees on manufacturers and other persons formerly and/or presently engaged in the stream of commerce of lead or products containing lead, or who are otherwise responsible for identifiable sources of lead, which have significantly contributed and/or currently contribute to environmental lead contamination.[6] (§ 105310, subd. (a).) The Department must determine fees based on the manufacturer's or other person's past and present responsibility for environmental lead contamination, or its 'market share' responsibility for this contamination. (§ 105310, subd. (b).)

---

Evidence at the trial in this matter established that the department defines lead poisoning as the presence of 15 to 19 micrograms of lead per deciliter of blood on two consecutive readings or 20 micrograms of lead per deciliter of blood on one reading.

[6] The 1991 Act defines "environmental lead contamination" as "the persistent presence of lead in the environment, in quantifiable amounts, that results in ongoing and chronic exposure to children." (§ 105280, subd. (g).)

"Those persons able to show that their industry did not contribute to environmental lead contamination, or that their lead-containing product does not and did not 'result in quantifiably persistent environmental lead contamination,' are exempt from paying the fees. (§ 105310, subd. (d).)

"The Legislature has authorized the Department to adopt regulations establishing the specific fees to be assessed the parties identified in section 105310, subdivision (a). (§ 105310, subd. (b).)" (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 871–872 [64 Cal.Rptr.2d 447, 937 P.2d 1350].)

The fees provided for in section 105310 are to be assessed and collected annually by the board. (§ 105310, subd. (c).) The annual fee assessment "shall be adjusted by the department to reflect both of the following: [¶] (1) [t]he increase in the annual average of the California Consumers Price Index . . . [¶] [and] (2) [t]he increase or decrease in the number of children in California who are receiving services pursuant to this article." (*Ibid.*)

D

*The Fee Regulations*

As noted, the 1991 Act imposed a fee on manufacturers and others responsible for significantly contributing to environmental lead contamination (§ 105310, subd. (a)), but assigned the department the responsibility of "establish[ing the] specific fees to be assessed" (*id.*, subd. (b)).

The fee regulations the department eventually promulgated are codified at California Code of Regulations, title 17, section 33020 et seq. The regulations impose fees on three "industries": architectural coating (paint)[7] distributors (Cal. Code Regs., tit. 17, § 33020), motor vehicle fuel (gasoline)[8] distributors (Cal. Code Regs., tit. 17, § 33025), and facilities releasing lead or lead compounds into ambient air in California (*id.*, § 33030). When the department first promulgated these regulations on an emergency basis in 1993, it explained that these were the industries it had "determined, for the purposes

---

[7] The term "architectural coating" covers "any product which is used as, or usable as, a coating applied to the interior or exterior surfaces of stationary structures and their appurtenances, to portable buildings, to pavements, or to curbs." (Cal. Code Regs., tit. 17, § 33002.) For ease of reference, however, we will use the word paint instead.

[8] With certain exceptions, the term "motor vehicle fuel" covers "gasoline, natural gasoline, blends of gasoline and alcohol containing more than 15 percent gasoline, and any inflammable liquid, by whatever name the liquid may be known or sold, which is used or is usable for propelling motor vehicles operated or suitable for operation on the highway." (Cal. Code Regs., tit. 17, § 33012.) For ease of reference, however, we will use the word gasoline instead.

of the fee assessment, . . . were historically and/or are presently engaged in the stream of commerce of lead or lead products which have significantly contributed historically and/or currently contribute to environmental lead contamination, defined as the persistent presence of lead in the environment, in quantifiable amounts, that results in ongoing and chronic exposure to children." The department noted that "[t]he regulations will enable the Board . . . to assess and collect the fees from these industries to support the activities specified in the [1991] Act. These regulations shall not be the basis for assigning liability for lead poisoning cases."

The department also explained why the paint and gasoline industries were primarily responsible for the fees: "Many products historically and currently contain lead . . . . However, most of these products do not result in *significant* environmental lead contamination resulting in ongoing and chronic exposure to children. . . . [T]he paint (architectural coatings) and petroleum (motor vehicle fuel) industries are overwhelmingly the largest historical consumers of lead in the stream of commerce resulting in environmental lead contamination, and subsequently resulting in ongoing and chronic exposure to children."

In determining how to allocate the fees between the paint and gasoline industries, the department used national lead consumption data available in the Minerals Yearbook, published by the Bureau of Mines, U.S. Department of the Interior, which "lists the annual tonnage of lead consumed in the manufacture of paints and gasoline for the nation as a whole from 1929 forward. The department adjusted the annual United States consumption data from 1929 through 1986 to California consumption by multiplying the national consumption statistics by the proportion of the United States population residing in California during the corresponding years. Based on this data, the department calculated that the gasoline industry had consumed roughly 85 percent and the paint industry had consumed roughly 15 percent of the total tonnage of lead consumed by the two industries combined."

In its final statement of reasons for enacting the emergency regulations in 1993, the department explained that it had "explored an alternative basis for apportionment of the fees . . . that involved a determination of the exact pathway of lead exposure by California children using exposure models developed by the U.S. EPA." "In 1986, the U.S. EPA calculated baseline exposures to lead for children and estimated additional exposures to children living in a home with lead based paint and/or living in an urban environment where contamination levels of atmospheric lead are higher because of increased combustion of leaded gasoline . . . . The 1986 model, however, does not take into account the complete phase-out of leaded gasoline in 1992. The model, therefore, overestimate[d] the contribution from the combustion

of leaded gasoline and require[d] adjustment." "The Department fe[lt] that the EPA models [we]re subject to ongoing research and [we]re not practical as the basis for determining the formula or the exact fees. Yet, the information d[id] provide a basis for demonstrating that the petroleum and paint industries significantly contributed to persistent environmental lead contamination resulting in chronic and ongoing exposure to children."

Since 1993, the fee regulations have allocated the total program fee among the responsible industries in the following proportions: 85.25 percent to the gasoline industry, 14.13 percent to the paint industry, and 0.62 percent to facilities currently releasing lead into the ambient air in California. Since 2001, to allocate the gasoline industry's share of the fee among the individual gasoline distributors, the regulations have required each gasoline distributor to pay a proportional share of the industry's total fee corresponding to the distributor's estimated share of the total gallons of gasoline distributed in or about 1991. (Cal. Code Regs., tit. 17, § 33025, subd. (a).)

E

*Sinclair Paint*

In 1997, our Supreme Court upheld the statute that imposes the lead program fees (§ 105310) against facial constitutional challenge in *Sinclair Paint*. In that case, Sinclair Paint Company paid nearly $98,000 in fees for 1991. (*Sinclair Paint Co. v. State Bd. of Equalization, supra*, 15 Cal.4th at p. 870.) Sinclair sought a refund on the theory that the fees were actually "taxes" imposed in violation of section 3 of Proposition 13. (*Sinclair*, at p. 870.) The board denied the administrative refund claim, but the superior court granted summary judgment to Sinclair on its complaint for a refund, and this court affirmed that judgment. (*Ibid.*)

On review, the Supreme Court rejected Sinclair's argument that the lead program fees were actually "taxes" because "the [1991] Act is not *regulatory* in nature, being primarily aimed at producing revenue." (*Sinclair Paint Co. v. State Bd. of Equalization, supra*, 15 Cal.4th at p. 877.) Instead, the court concluded "section 105310 imposes bona fide regulatory fees" "under the police power" which are not subject to Proposition 13's requirement that " 'State taxes . . . must be imposed by an Act passed by not less than two-thirds of all members . . . of the Legislature,' " because "[i]t requires manufacturers and other persons whose products have exposed children to lead contamination to bear a fair share of the cost of mitigating the adverse health effects their products created in the community." (*Id.* at pp. 877, 872–873; see *id.* at p. 875.) The court held "the police power is broad enough to include mandatory remedial measures to mitigate the *past, present, or*

*future* adverse impact of the fee payer's operations, at least where, as here, the measure requires a causal connection or nexus between the product and its adverse effects." (*Id.* at pp. 877–878.)

In reaching its conclusion, however, the Supreme Court specifically observed that "Sinclair has not yet sought to establish that the amount of the fees [it paid] bears no reasonable relationship to the social or economic 'burdens' that Sinclair's operations generated." (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at p. 876.) In reversing the judgment, the court noted that Sinclair "should be permitted to attempt to prove" any such contention at trial. (*Id.* at p. 881.)

F

*The 2002 Fee and Subsequent Litigation*

Turning, finally, to the facts of this case, for the 2002 calendar year the board issued lead program fee assessments to Shell that totaled $3,910,359.10. Shell's fees were determined pursuant to the methodology set forth in the regulations, i.e., the total fees collected for that year were multiplied by 85.25 percent and then Shell was assigned a portion of that amount based on Shell's deemed 1991 market share of the total gasoline distributed.

Shell paid the fees, then filed administrative refund claims. The board did not mail a notice of action on the claims within six months of the filing, so in June 2005, Shell properly deemed the refund claims denied and filed this action in superior court. (See Rev. & Tax. Code, § 43474.) Subsequently, the court allowed the National Paint & Coatings Association to intervene in the action on the side of the department and the board.

In its amended complaint, filed in January 2006, Shell sought a refund of its 2002 fees plus interest, attorney fees, and costs. The action ultimately went to a court trial in December 2007 and February 2008 on three causes of action, only two of which are relevant for our purposes.[9] In the first cause of action, Shell alleged the department had "failed to meet its statutory duty pursuant to . . . Section 105310 in that it erroneously and illegally apportioned a disproportionate share of the [fees] to the [gasoline] industry and/or Shell . . . in that the allocation does not reflect the [gasoline] industry's or Shell's 'past or present' or 'market share' responsibility for the burdens

---

[9] Shell does not raise any argument on appeal relating to the fourth cause of action, which alleged the 2002 fees violated the equal protection clauses of the state and federal Constitutions.

addressed by the [lead program], nor does the allocation bear a reasonable relationship to the [gasoline] industry's or Shell's contribution to the burdens addressed by the [lead program]." In the second cause of action, Shell alleged the 2002 fees were unconstitutional taxes in violation of Proposition 13 because there was "no nexus between the [fee] payors and the problems addressed by the [lead program] during the Year at Issue."

The trial court rejected Shell's arguments. The court concluded the problem the lead program addresses "is lead contamination that exposes children to a risk of any lead poisoning, not just contamination that results in 'cases' of lead poisoning." The court determined that this conclusion was "fatal to Shell's second cause of action [based on Proposition 13] because Shell did not present any evidence at trial regarding the gasoline industry's responsibility for general 'environmental lead contamination,' " but "only . . . evidence disputing its responsibility for 'cases of lead poisoning.' " Thus, the court concluded Shell had "failed to meet its burden to prove that the amount of the . . . fees allocated to the gasoline industry is not reasonably related to that industry's burden on the [lead] program." In the alternative, the court concluded that even if "the state has the burden of establishing that the fees bear a reasonable relationship to the fee payers' burden on the regulatory activity, [the department] . . . met its burden in this case" of showing the "fees are reasonably related to the burden of environmental lead contamination."

The trial court determined that this same reasoning was fatal to Shell's first cause of action because the regulations "assess[] fees on persons responsible for identifiable and significant sources of lead exposure to children," just as the 1991 Act requires.

From the resulting judgment, Shell timely appealed.

## DISCUSSION

### I

### *The Lead Program Fee Is Not a Tax Under Proposition 13*

Shell contends "[t]he issue in this case is whether the 'fees' imposed by the [department]'s regulations are actually unlawful taxes imposed in violation of . . . ('Proposition 13')." (Fn. omitted.) According to Shell, the fees are imposed to fund the lead program, the purpose of which is "to i[]dentify the causes and prevent the occurrence of childhood lead poisoning." In Shell's view, "the . . . fees imposed on the gasoline industry, including [Shell], are invalid because the fees fail to bear a reasonable relationship to the burdens

created by the gasoline industry on the [lead] Program" in that "childhood lead poisoning in California is predominantly caused by lead-based paint and other sources." As we will explain, we reject this contention.

At the outset, the parties argue over both the standard of review in this court and who bore the burden of proof in the trial court. For our purposes, it suffices to say that: (1) "whether impositions are 'taxes' or 'fees' is a question of law for the appellate courts to decide on independent review of the facts" (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at p. 874); and (2) regardless of who bore the burden of proof in the trial court, " '[a] judgment or order of the lower court is *presumed correct*' " " 'and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]). Thus, it falls to Shell to persuade us the trial court erred in concluding the lead program fees Shell paid for the 2002 calendar year were unconstitutional taxes rather than permissible regulatory "fees." As we will explain, Shell has failed to do so.

Shell's arguments rest on the "reasonable relationship" test the Supreme Court mentioned, but did not have occasion to apply, in *Sinclair Paint.* As we have noted, the Supreme Court observed that on remand Sinclair "should be permitted to attempt to prove" "that the amount of the fees [it paid] bears no reasonable relationship to the social or economic 'burdens' that Sinclair's operations generated." (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at pp. 881, 876.) In support of this observation, the Supreme Court cited the decision in *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132 [250 Cal.Rptr. 420]. (*Sinclair Paint,* at pp. 876, 881.) Accordingly, we turn to *San Diego Gas* for a better understanding of the "reasonable relationship" test.

In *San Diego Gas,* the San Diego County Air Pollution Control District "apportion[ed] the [indirect] costs of its permit programs among stationary sources of pollution required to obtain operating permits under [the] Health and Safety Code" by charging "additional renewal permit fees based on the average pollution generated by a facility within a specific industry."[10] (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d at pp. 1135, 1136.) The plaintiff challenged the

---

[10] The district's indirect costs were those costs "related to the overall program but not directly related to permit activity—i.e., personnel matters, rule development, correspondence, complaint investigations, hearing board participation, consultation with other agencies, etc." (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d at p. 1136.) In other words, these indirect costs were "not reasonably identifiable with specific industrial polluters." (*Id.* at p. 1135.)

"emissions-based fees" on the ground they were a " 'special tax' " under section 4 of Proposition 13, rather than a "regulatory fee." (*San Diego Gas*, at p. 1145.)

■ In concluding the fees were not taxes under Proposition 13, the Court of Appeal observed that for "a fee [to be] a regulatory fee and not a special tax," the costs of the regulatory activity to which the fee relates must be apportioned "so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist., supra*, 203 Cal.App.3d at p. 1146.) The court then determined that "the allocation of costs based on emissions fairly relates to the permit holder's burden on the district's programs. [¶] The district's report explains in detail the rationale and method used for apportioning the costs on an emissions-based, rather than labor-based, standard for apportioning indirect costs. If the labor-based standard, already used to apportion direct costs, were also used for indirect costs small polluters would pay fees greater than their proportionate contribution to pollution, whereas large polluters would pay proportionately less. For example, under the labor-based system for direct costs, service stations pay about 34 percent of the total annual permit renewal fees, and emit cumulatively only 1 percent of the industrial pollution. In contrast, the 31 major polluters pay about 13 percent of the fees, but emit 38 percent of the industrial pollution and 51 percent of the pollution from permitted facilities. Moreover, using an emissions-based standard for indirect costs would provide an incentive to large polluters to reduce existing emissions to reduce fees. [¶] . . . [¶] The district's determination that a purely labor-based standard results in small polluters paying fees greater than their proportionate share of pollution reasonably justifies using an emissions-based standard to more equitably divide the costs based on the amount of pollution caused. [¶] . . . The purpose for the district's existence is to achieve and maintain air quality standards [citation], thus from an overall perspective it is reasonable to allocate costs based on a premise that the more emissions generated by a pollution source, the greater the regulatory job of the district." (*Id.* at pp. 1146–1148, fns. omitted.)

This court has observed that *San Diego Gas* "suggest[s] a flexible assessment of proportionality within a broad range of reasonableness in setting fees." (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 949 [94 Cal.Rptr.2d 535].) Furthermore, in *California Association of Professional Scientists*, this court went on to hold that "a regulatory fee, to survive as a fee, does not require a precise cost-fee ratio. A regulatory fee is enacted for purposes broader than the privilege to use a service or to obtain a permit. Rather, the regulatory program is for the protection of the health and safety of the public. The legislative body charged with enacting laws pursuant to the police power retains the discretion to

apportion the costs of regulatory programs in a variety of reasonable financing schemes. An inherent component of reasonableness in this context is flexibility. We agree with the notion that shifting the costs of environmental protection to those who seek to impact our natural resources does not subvert the objectives embodied in Proposition 13. Hence, a regulatory fee does not violate California Constitution, article XIII A when the fees collected do not surpass the costs of the regulatory programs they support *and the cost allocations to individual payors have a reasonable basis in the record.*" (*California Assn. of Prof. Scientists*, at p. 950, italics added.)

With this understanding of the "reasonable relationship" test for determining whether a purported regulatory fee is actually a tax under Proposition 13, we turn to Shell's arguments. Shell contends the lead program fees it paid for 2002 were a tax under this test because "the amount of fees levied on the gasoline industry is not proportional to the burden the gasoline industry places on the [lead] Program." According to Shell, "when fee-payers' operations create a problem resulting in the need for a regulatory program, the State may shift the costs of that program from the State to fee-payers under the police power because the fee-payers are deemed *responsible for* the problem that the program was created to address. . . . Thus, fee-payers' 'burdens on' the 'regulatory activity' should be determined by looking at the burdens actually addressed by the regulatory program, as evidenced by the program's activities and expenditures. [¶] In this case, the regulatory activities are directed at managing childhood lead poisoning, not general environmental lead contamination. . . . Because the gasoline industry is not reasonably responsible for 85% of the cases of childhood lead poisoning, its 85% fee allocation is not a valid regulatory fee."

Given that we must employ "a flexible assessment of proportionality within a broad range of reasonableness" in determining the constitutionality of the lead program fees (*California Assn. of Prof. Scientists v. Department of Fish & Game, supra*, 79 Cal.App.4th at p. 949), we find no merit in Shell's argument that, essentially, the *only* reasonable manner in which the department could have allocated the lead program fee would have been to allocate it proportionally based on responsibility for cases of childhood lead poisoning, rather than on responsibility for environmental lead contamination.

■ In the 1986 Act, in which the Legislature declared its intent to establish the lead program, the Legislature's findings centered on childhood lead "exposure." (§ 124125.) Specifically, the Legislature found that "childhood lead *exposure* represents the most significant childhood environmental health problem in the state," "excessive lead *exposure* causes acute and chronic damage to a child's renal system, red blood cells, and developing brain and nervous system," and "knowledge about where and to what extent

harmful childhood lead *exposures* are occurring in the state could lead to the prevention of these *exposures* . . . ." (§ 124125, italics added.) Based on these findings, the Legislature expressed its intent to establish the lead program to (among other things) "identify and target areas of the state where childhood lead *exposures* are especially significant." (*Id.*, subd. (b), italics added.)

In the 1989 Act, the Legislature directed the department, through the lead program, to "continue to take steps that it determines are necessary to reduce the incidence of excessive childhood lead *exposure* in California." (§ 124165, italics added.)

■ In the 1991 Act, in which the Legislature imposed the fee at issue here to fund the ongoing operation of the lead program (§§ 105305, 105310), the Legislature again focused on childhood lead *exposure* and its conse-quences. The Legislature required that "all children . . . be evaluated for risk of lead poisoning by health care providers during each child's periodic health assessment." (§ 105285, subd. (a).) If determined to be "at risk" for lead poisoning, a child must be "screened"—that is, the concentration of lead in the child's blood must be measured—unless the child's parent or guardian refuses to consent. (§§ 105280, subd. (e), 105285, subds. (b) & (c).) To fully implement and effectuate these requirements, the Legislature gave the depart-ment "broad regulatory authority" to, among other things, "develop[] . . . protocols to be utilized in screening and the procedures for changing those protocols when more accurate or efficient technologies become available," "designat[e] . . . laboratories which are qualified to analyze whole blood specimens for concentration of lead and . . . monitor[] . . . those laboratories for accuracy," "develop[] . . . reporting procedures by laboratories," and "[r]eimburse[] for state-sponsored services relat[ing] to screening and appro-priate case management." (§ 105300, subds. (a), (b), (c) & (d).)

Obviously, the *risk* of childhood lead poisoning results from childhood lead *exposure*. Because "all children" in California are exposed to lead in the environment, all of them must be evaluated for the risk of lead poisoning, and if found at risk, screened for lead poisoning, even though not all of them will have enough lead in their blood to actually *have* lead poisoning. In this manner, under the mandate of the 1991 Act, the lead program addresses, more broadly, the consequences of childhood lead exposure resulting from lead contamination in the environment and not simply cases of lead poisoning.

■ Furthermore, the Legislature specifically focused on exposure rather than poisoning when it imposed the fee to fund the lead program on those responsible for significantly contributing to "environmental lead contamina-tion" (§ 105310, subd. (a)), which the Legislature defined as "the persistent presence of lead in the environment, in quantifiable amounts, that results in

ongoing and chronic *exposure to children*" (§ 105280, subd. (g), italics added). Indeed, the Legislature mandated that, "[t]o the maximum extent practicable," the fees be assessed based on "[a] person's past and present responsibility for environmental lead contamination" and "[a] person's 'market share' responsibility for environmental lead contamination." (§ 105310, subd. (b)(1) & (2).)

Thus, the Legislature itself created a program to address the harmful effects of childhood lead exposure and imposed a fee on those persons responsible for significantly contributing to the presence of lead in the environment that results in that exposure. These statutes leave little doubt that the purpose of the lead program is to address environmental lead contamination resulting in childhood lead exposure, and not just cases of childhood lead poisoning, as Shell contends.

Nevertheless, Shell persists that the "burden" the 1991 Act was "intended to address is childhood lead poisoning." In support of its argument, Shell focuses on other language in the 1991 Act, on materials describing the purpose of the lead program "published by either the [lead program] Branch" or the department, on "expert" testimony presented by Shell at trial, and on language in *Sinclair Paint* that Shell claims supports its position.

While we certainly agree that identifying and addressing cases of lead poisoning in children is at the core of the lead program, it does not follow that in allocating the fee imposed to fund the program's activities the department was constrained to an allocation method based only on responsibility for actual cases of lead poisoning in order for the fee to be a legitimate regulatory fee rather than a tax. Viewed more broadly, the purpose of the lead program is to identify and address the consequences of the persistent presence of lead in the environment, which is what results in ongoing and chronic childhood lead exposure, which in turn only sometimes results in childhood lead poisoning. Indeed, as we have noted, the Legislature itself determined that the fee to fund the program should be imposed on those responsible for significantly contributing to lead contamination in the environment that results in childhood lead exposure. The department's fee regulations do just that by allocating the fee proportionally among those who are responsible for significantly contributing to such environmental lead contamination based on their "market share" responsibility.

■ *Sinclair Paint* supports our conclusion that the "burden" the lead program addresses is environmental lead contamination, rather than just childhood lead poisoning. In holding that the 1991 Act imposes "bona fide regulatory fees," the Supreme Court recognized that section 105310 "requires manufacturers and other persons whose products have exposed children to

lead contamination to bear a fair share of the cost of mitigating the adverse health effects their products created in the community." (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at p. 877.)

■   Based on our determination that the purpose of the lead program is to address environmental lead contamination that results in childhood lead exposure, which in turn only *sometimes* results in childhood lead poisoning, we conclude the fees the department apportioned to the gasoline industry bear a reasonable relationship to the "burdens" the gasoline industry's operations generated. (See *Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at pp. 876, 881.) Stated another way, there is a reasonable basis in the record for the department's allocation of the lead program fee to the gasoline industry. (See *California Assn. of Prof. Scientists v. Department of Fish & Game, supra,* 79 Cal.App.4th at p. 950.) Accordingly, the trial court did not err in rejecting the second cause of action in Shell's refund claim based on the theory that the lead program fee is an unconstitutional tax under Proposition 13.

II

*The Lead Program Fee Is Not Inconsistent with and Does
Not Violate the 1991 Act*

A

*Shell Has Not Identified any Significant Contributors to
Environmental Lead Contamination Who Are Not Allocated
Part of the Lead Program Fee*

In an argument that apparently ties to Shell's first cause of action, Shell argues the lead program fee is "invalid because it is inconsistent with the [1991] Act." Noting that the Legislature imposed the fee on significant contributors to "environmental lead contamination" (§ 105310, subd. (a)), Shell argues that "[e]ven if th[at] term . . . contemplated exposure of children to lead generally, whether or not they suffered from lead poisoning, the current allocation would still fail to comply with this statutory mandate because no portion of the fee is imposed on many other industries that [the department] itself currently identifies as significantly contributing to childhood lead poisoning. Surely, if such industries are causing childhood lead poisoning, these same industries are contributing to 'environmental lead contamination.' "

■   The flaw in this argument is that just because an industry might be determined to be a significant cause of cases of childhood lead poisoning

does not mean that industry is a significant contributor to the broader problem of environmental lead contamination resulting in childhood lead exposure, which is what the lead program addresses. Recall that "environmental lead contamination" means "the persistent presence of lead in the environment, in quantifiable amounts, that results in ongoing and chronic exposure to children." (§ 105280, subd. (g).) Thus, for example, even if it could be determined that "home remedies" caused 10.3 percent of lead poisoning cases,[11] it would not follow that the person responsible for those "home remedies" (assuming such responsibility could be assigned) could be reasonably characterized as a significant contributor to "the persistent presence of lead in the environment . . . that results in ongoing and chronic exposure to children."

Because Shell has not identified any evidence, substantial or otherwise, indicating that there are other industries that are significant contributors to environmental lead contamination to which the department has not allocated any portion of the lead program fee, Shell's argument that the fee allocation is inconsistent with the 1991 Act is without merit.

B

*The 1991 Act Does Not Require the Department to
Periodically Review and Revise the Fee Allocation*

Shell also argues that the department "has a duty to review and revise the [lead program] fee based upon a fee-payer's current responsibility for environmental lead contamination leading to childhood lead poisoning" and "[b]y failing to provide a mechanism for review, the fees violate the [1991] Act" because "[a] static allocation fails to account for" "development in the science or our understanding of the environment."

█ We are not persuaded. Nothing in the 1991 Act requires the department to "review and revise" the fees assessed under the 1991 Act. Indeed, subdivision (b) of section 105310 indicates only that the department was to "establish specific fees to be assessed" "[a]fter July 1, 1992, but on or before January 1, 1993." The statute provides for an annual adjustment of the fee assessment to reflect changes in the annual average of the California Consumer Price Index and changes in the number of children in California

---

[11] Shell cites a report by the department in which it was noted that in cases of lead poisoning between 2000 and 2002 in which potential sources of lead exposure were reported, a "[h]ome remedy" was reported as a *potential* source in 10.3 percent of the cases. The report also notes, however, that "[m]any children have multiple potential sources of lead exposure and exposures may be cumulative." That a "home remedy" is one of many potential sources of lead poisoning hardly constitutes "substantial evidence . . . that . . . home remedies are [a] significant source[] of childhood lead poisoning," as Shell argues.

receiving services under the lead program (§ 105310, subd. (c)(1) & (2)), but there is nothing in the 1991 Act that requires the department to periodically reassess its allocation of the fee among the significant contributors to environmental lead contamination.

This is not to say that the allocation of the lead program fee is sacrosanct, written in stone for all time. If, at some point, Shell or any other interested party can demonstrate that developments in science or in our understanding of the environment show that the department's allocation of the lead program fee no longer fairly or reasonably corresponds to the actual responsibility for significant contributions to environmental lead contamination, both current and historical, that results in childhood lead exposure, then that party will have a basis for challenging the fee allocation as violative of Proposition 13. At this point, however, Shell's only argument is that under the 1991 Act, the department has a duty to review and revise the fee allocation periodically. We find no such duty.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

Sims, Acting P. J., and Raye, J., concurred.