Filed 5/7/18

# IN THE SUPREME COURT OF CALIFORNIA

CALIFORNIA BUILDING INDUSTRY )
ASSOCIATION, )
 )
  Plaintiff and Appellant, )
 )  S226753
 v. )
 ) Ct.App. 1/2 A137680
STATE WATER RESOURCES )
CONTROL BOARD, )
 ) San Francisco City & County
  Defendant and Respondent. ) Super. Ct. No. CGC-11-516510
_____)

Here, we address three questions: (1) whether a two-member vote by the State Water Resources Control Board (Board), approving a permit fee schedule under Water Code[1] section 13260, effectively adopted the fee schedule; (2) whether the Board violated requirements of subdivision (d)(1)(B) or (f)(1) of section 13260 in setting the permit fees; and (3) whether the Board's adoption of the fee schedule violated constitutional restrictions on regulatory fees under article XIII A of the California Constitution. We hold that the fee schedule was properly adopted and violated neither the statutes nor the state Constitution. We affirm the judgment of the Court of Appeal, which reached the same conclusions.

---

[1] All unspecified statutory references are to the Water Code.

## I. BACKGROUND

Under California law, primary responsibility for the coordination and control of water quality belongs to the Board and nine regional water quality control boards.  (§ 13001; see also *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619.)  The Board establishes statewide policy, while the regional boards adopt water quality control plans and issue permits governing the discharge of waste.[2]  (*Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, 755-756.)

To finance the permit programs, the Legislature authorized the imposition of a fee for issuance of a permit.  (§ 13260, subd. (d)(1)(A).)  The Board establishes the fee schedule (§ 13260, subds. (d)(1)(A), (f)(1)),[3] and must set "total revenue collected . . . through annual fees . . . at an amount equal to the revenue levels set forth in the Budget Act for this activity."  (§ 13260, subd. (f)(1).)  The total amount of annual fees is limited to an "amount necessary to recover costs incurred in connection with the issuance, administration, reviewing, monitoring, and enforcement" of waste discharge permits.  (§ 13260, subd. (d)(1)(B).)  All fees are deposited in the Waste Discharge Permit Fund (Permit Fund).  Upon appropriation by the Legislature, the Board may expend Permit Fund money solely

---

[2]     Every person discharging or proposing to discharge waste that could affect the quality of state waters must file a waste discharge report with the appropriate regional board.  (§ 13260, subd. (a)(1).)  The regional board then "prescribe[s] requirements as to the nature" of the discharge.  (§ 13263, subd. (a).)  The regional board's prescription of requirements is, in essence, a permit to discharge waste into state waters subject to conditions set by the regional board.  (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875.)

[3]     The Board must annually adopt a fee schedule.  (§ 13260, subd. (f)(1).)  The schedule is found at title 23, section 2200 of the California Code of Regulations.

for the purpose of carrying out the Porter-Cologne Water Quality Control Act (§ 13000 et seq.). (§ 13260, subd. (d)(2)(A).)

On September 19, 2011, the Board met to adopt the fee schedule for fiscal year 2011-12. Staff reported on the balance of the Permit Fund and on the recently enacted Budget Act for fiscal year 2011-12. The balance of the Permit Fund at the beginning of fiscal year 2010-11 had been $6.6 million. The Board had collected a total of $74.5 million in permit fees, plus $618,000 in other revenue. It had incurred $73.3 million in combined program costs, producing an ending Permit Fund balance of $8.4 million. In the Budget Act, the Legislature appropriated $103 million from the Permit Fund to support the Board's activities. Of that amount, the staff determined the Board would have to recover $100.7 million from fee revenues. The fee schedule established for fiscal year 2010-11 would produce only $73.7 million, approximately $27 million short of the amount required to eliminate the projected deficit and meet budgetary expenditures. The staff proposed several fee schedules for the Board to consider.

By statute, the Board has five members. (§ 175.) At the time of the September 2011 meeting, two of those seats were vacant. Of the three members who were present at the meeting, two voted to approve one of the proposed schedules. The third member abstained. Based on that vote, the Board adopted emergency regulations retroactively revising the fee schedule as of July 1, 2011.

In December 2011, plaintiff California Building Industry Association challenged the Board's approval of the fee schedule, claiming the schedule: (1) was not approved by the required number of Board members; (2) violated the requirements of section 13260, subdivisions (d)(1)(B) and (f)(1); and (3) violated

constitutional restrictions on regulatory fees.[4]  Plaintiff sought declaratory and injunctive relief, and a writ of mandate directing the Board to adopt a new fee schedule.  The trial court rejected all of plaintiff's challenges and entered judgment for the Board.  The Court of Appeal affirmed in a split decision.

## II.  DISCUSSION

Plaintiff's challenges are both procedural and substantive.

### A.  *Procedural Challenge*

Plaintiff urges the fee schedule was not approved by the necessary number of Board members because only two members voted for its adoption.  Plaintiff argues the Water Code requires three affirmative votes for the Board to take any final action.  It contends the Water Code supplants the general rule regarding the number of votes required for action by a collective body.  Those arguments fail.

The "almost universally accepted common-law rule is [that] . . . in the absence of a contrary statutory provision, a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body."  (*FTC v. Flotill Products* (1967) 389 U.S. 179, 183; accord *People v. Harrington* (1883) 63 Cal. 257, 259-260.)  Under this rule, "a legislative body of five members adopts a motion if three members are present, two vote in favor, and one votes against." (66 Ops.Cal.Atty.Gen. 336 (1983).)

The general rule applies absent a contrary statute.  There are two relevant Water Code provisions.  Section 181 provides that "[t]hree members of the [Board] shall constitute a quorum for the purpose of transacting any business of

---

[4]  Plaintiff also alleged the retroactive application of the fee schedule violated due process principles, but abandoned this argument on appeal.

the board."[5]  (§ 181.)  Section 181's quorum threshold was satisfied.  Plaintiff does not argue otherwise, but relies on section 183, which authorizes the Board to hold hearings and conduct investigations to carry out its authority.  A hearing or investigation may be conducted by any authorized member, "but any *final action* of the board shall be taken by a majority of *all* the members of the board, at a meeting duly called and held."  (§ 183, italics added.)[6]

Plaintiff argues that, under section 183, any "final action" of the Board, including the adoption of a fee schedule, requires *approval* by three members. The Board raises two counterarguments.  First, that the statute's requirement only applies when the Board has delegated its hearing or investigation powers to a single member.  Second, even when section 183 applies, it only demands that three members *participate* in the Board's decision, as happened here.

The Court of Appeal split on this question.  The majority held that section 183's requirement applies only when the Board delegates "authority to one member to conduct a hearing or meeting."  There was no delegation of authority here; therefore, the only constraint on the Board's action was the quorum threshold in section 181, which was satisfied.  The majority also reasoned that,

---

[5]     "A quorum is the number or proportion of the members of an organization that must be present at a meeting in order to transact business legally."  (Sturgis, Standard Code of Parliamentary Procedure (4th ed. 1966) p. 111.)

[6]     Section 183 reads in its entirety as follows:  "The board may hold any hearings and conduct any investigations in any part of the state necessary to carry out the powers vested in it, and for such purposes has the powers conferred upon heads of departments of the state by Article 2 (commencing with Section 11180), Chapter 2, Part 1, Division 3, Title 2 of the Government Code.  [¶]  Any hearing or investigation by the board may be conducted by any member upon authorization of the board, and he shall have the powers granted to the board by this section, but any final action of the board shall be taken by a majority of all the members of the board, at a meeting duly called and held.  [¶]  All hearings held by the board or by any member thereof shall be open and public."

5

"unlike other statutes that expressly conflict with the common law rule . . . , [section 183] does not alter the common law quorum rule set forth in section 181."

The dissent disagreed, relying primarily on an item of legislative history from a 1969 bill that amended section 183. (Assem. Bill. No. 412 (1969 Reg. Sess.) § 1.) That legislation added the word "all" to the statute's second sentence, so that it read that a final action must "be taken by a majority of *all* the members of the board." (Stats. 1969, ch. 800, § 1, p. 1617, italics added.) The bill's legislative history includes a letter by Senator Gordon Cologne to the Lieutenant Governor, Ed Reinecke. Embedded within that letter is an internal senate committee report discussing the intent of the amendment. The quoted report states: "The present law is ambiguous as to whether final action by the state board always requires a majority consisting of three members of the five-man state board, or whether the majority required is only that of the 'members of the board (present) at a meeting duly called and held.' In the latter case three members could constitute a quorum, and the vote of two members would constitute a majority of the members at the meeting. An amendment has been made to this section to remove the ambiguity by requiring that final board action shall always require the concurrence of a majority of all the members of the board, not merely a majority of a quorum." (3 Sen. J. (1969 Reg. Sess.) p. 5154.) The dissent concluded that the letter and the report were "virtually conclusive proof" that section 183 was intended to override the general rule and section 181 when the Board takes any final action, including the adoption of a fee schedule. The dissent concluded in error.

We review questions of statutory construction de novo. Our primary task "in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.]" (*Tuolumne Jobs & Small*

6

*Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.)  We construe the statute's words in context, harmonizing statutory provisions to avoid absurd results.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 96.)  If the statutory text is susceptible to more than one reasonable construction, we may consider extrinsic aids such as legislative history to facilitate our interpretative analysis.  (*Flour Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198.)

With those principles in mind, we agree with the majority below.  Section 183's requirement that a final action "be taken by a majority of all the members of the board" only applies when the Board has authorized a single member to conduct a hearing or investigation under section 183.   This conclusion is rooted in the language and structure of section 183 when read in the context of section 181 and other provisions of the Water Code.

To understand the mechanics of this scheme, it is helpful to begin with section 181, which provides that three members of the Board constitute a quorum for the purpose of transacting any Board business.  The Water Code does not define the phrase "transacting any business," but the applicable regulations provide illumination.  The Board's business includes:  holding public meetings (Cal. Code Regs., tit. 23, § 647 et seq.); holding adjudicative proceedings and issuing decisions (Cal. Code Regs., tit. 23, § 648 et seq.); conducting rulemaking and informational proceedings (Cal. Code Regs., tit. 23, § 649 et seq.); and adopting, amending, and repealing rules and regulations (*ibid.*).  For each of these functions, section 181 establishes a quorum threshold which is consistent with the common law rule.  Section 183 contains a limited exception to the quorum requirement for a specific Board function.  It permits the Board to authorize a single member to conduct a hearing or an investigation, and gives that member all the powers granted to the Board, but it requires that "any final action . . . shall be taken by a majority of all the members of the board."  (§ 183.)

7

Read together, the plain language and structure of the two sections support the conclusion that section 183's final action requirement only applies when the Board has delegated its hearing or investigation powers to a single member. By its own terms, section 183 relates only to the Board's power to hold hearings and conduct investigations. It does not mention the Board's other functions. Its final action requirement must be read in that context. In addition, as the majority below correctly noted, the use of the conjunction "but" in section 183 links the phrase containing the final action requirement to the phrase that refers to a hearing conducted by a single member. The majority below also correctly noted that there would be no need for a final action to be taken at a *subsequent* meeting, as section 183 requires, except when "fewer than a quorum participated in the first hearing or meeting." When read in the context of section 181 and the applicable regulations, it is evident that the final action requirement is meant to prevent the Board from delegating its final decisionmaking authority to a single member.

The Attorney General reached this same conclusion in a 1956 opinion. (28 Ops.Cal.Atty.Gen. 259 (1956).) When that opinion was issued, the Board had three members. (*Id*. at p. 260.) Former section 193, like current section 183, permitted the Board to authorize a single member to conduct a hearing or investigation, but required that any final action "be taken by the board as a whole." (Former § 193, added by Stats. 1956, 1st Ex. Sess., ch. 52, § 7, p. 426, and renumbered as § 183 by Stats. 1957, ch. 1932, § 32, p. 3374.) The question presented to the Attorney General was whether former section 193 required that all three members participate in *every* final action, or whether some final actions could be taken by two members under the rule permitting a board to act by a majority of a quorum. (28 Ops.Cal.Atty.Gen., *supra*, 260.) The Attorney General found that the language requiring final action by the Board as a whole "simply constitute[d] a *proviso* to the clause [that authorized] the board to delegate all its

8

powers to any *one* of its members. The phrase constitutes a command only that the board not delegate to *one* member its final decision-making power." (*Ibid.*)

Opinions of the Attorney General, " 'while not binding, are entitled to great weight. [Citations.] In the absence of controlling authority, these opinions are persuasive "since the Legislature is presumed to be cognizant of that construction of the statute." ' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17, quoting *Napa Valley Educators' Assn. v. Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 251.) If the Legislature disagreed with the Attorney General's opinion, it could have drafted section 183 differently. (See *Rank*, at p. 17.) It did not do so.

Plaintiff and the dissent below rely heavily on Senator Cologne's letter and the internal committee report. As to the letter, we do not consider the motives or understandings of individual legislators who voted for a statute when attempting to construe it. (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 931.) This is true even when the legislator who authored the bill purports to offer an opinion. This rule exists because there is " ' "no guarantee . . . that those who supported [the] proposal shared [the author's] view of its compass." ' " (*Id.* at p. 931, quoting *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700.) A contrary rule would allow an individual legislator to characterize an enactment in ways he or she might have preferred or intended but for which there was not sufficient legislative support. Any conclusion that the Cologne letter was virtually conclusive proof of legislative intent ignores this long-standing principle.

As to the quoted report, the dissent overstates its relevance. The report relates only to the amendment of section 183. It does not mention section 181. As explained, section 183's rule only applies when the Board has delegated its powers to a single member. Senator Cologne's letter and the report can be read as relating

9

the rule that applies only when such a delegation has occurred. Additionally, the letter and report were printed in the Senate Journal two days after the Senate passed the amendment. Thus, it is not clear that Senate members or staffs read the letter or the accompanying report before passing the amendment.

Plaintiff also argues *Marina County Water Dist. v. State Water Resources Control Bd.* (1984) 163 Cal.App.3d 132 supports its position. But the *Marina* court did not interpret section 183. It simply mentioned the statute in discussing an earlier judgment against the Board. (*Marina*, at p. 136.) It is axiomatic that cases are not authority for propositions that are not considered. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160.)

In adopting the fee schedule, the Board did not delegate to a single member the authority to conduct an investigation or hold a hearing. As a result, section 183's final action requirement did not constrain the Board's authority to adopt the schedule. Section 181's quorum threshold was satisfied. Plaintiff's procedural challenge to the fee schedule fails.

B. *Substantive Challenges*

1. *Statutory Challenges to Storm Water Fee*

The fee schedule included eight different waste discharge permit fees. Each corresponded to a Board-created permit category, referred to as a program area. Storm water is one of the program areas.[7] Plaintiff challenges the storm water permit fee on two statutory grounds. First, plaintiff alleges the fee violated section 13260, subdivision (d)(1)(B), which provides that "[t]he total amount of annual fees collected pursuant to this section shall equal that amount necessary to

---

[7] The other seven program areas are: (1) the national pollutant discharge elimination system (NPDES); (2) waste discharge requirements; (3) land disposal – tipping fee; (4) land disposal – no tipping fee; (5) 401 certification; (6) confined animal facilities; and (7) irrigated lands.

10

recover costs incurred in connection with the issuance, administration, reviewing, monitoring, and enforcement of waste discharge requirements and waivers of waste discharge requirements." Second, plaintiff alleged the Board violated section 13260, subdivision (f)(1), which provides that "[i]f the state board determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the Budget Act, the state board may . . . adjust the annual fees to compensate for the over and under collection of revenue."

In support of its statutory claims, plaintiff points to evidence that storm water permit fee revenues exceeded storm water program area expenditures in each of the seven years preceding fiscal year 2011-12. During that period, revenues exceeded expenditures by a total of $23.5 million. Plaintiff argues that storm water permit fee revenues would continue to exceed program area costs in violation of section 13260, subdivision (d)(1)(B). Plaintiff also argues the Board's failure to decrease the amount of the fee to compensate for past over-collections violated section 13260, subdivision (f)(1). The trial court and the Court of Appeal rejected both arguments.

We reject them as well. Plaintiff's first argument misconstrues section 13260, subdivision (d)(1)(B). That subdivision does not require fee revenues for *each* permit category to be less than the expenditures attributable to *that* individual program area. Rather, it requires that the fee revenues for *all* permit categories not exceed expenditures for *all* program areas. The evidence shows that, during the same seven-year period mentioned above, fee revenues for the other seven program areas fell short of costs by $34.2 million. In other words, total costs across all program areas exceeded fee revenues by $10.7 million. More importantly, for fiscal year 2011-12, the Board's staff report projected that fee revenues for all program areas would be $100.7 million, while costs would be $101.4 million. Because the fee schedule was projected to generate less than the

11

amount necessary to cover all program costs, it did not violate section 13260, subdivision (d)(1)(B).[8]

Plaintiff's second argument misreads section 13260, subdivision (f)(1). That subdivision requires the Board to set total fee revenue at an amount equal to the revenue levels set out in the Budget Act and to "automatically adjust the annual fees each fiscal year to conform with the revenue levels set forth in the Budget Act for this activity." (§ 13260, subd. (f)(1).) If the Board "determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the Budget Act," it *may* "further adjust the annual fees to compensate for the over and under collection of revenue." (*Ibid*.) But section 13260, subdivision (f)(1) does not *compel* the Board to adjust either the whole fee schedule or a specific permit fee if past revenues exceeded past expenditures. Plaintiff's argument to the contrary is without merit.[9]

### 2. *Constitutional Challenges*

Plaintiff's final argument is that the fees violated constitutional restrictions contained in article XIII A of the California Constitution (article XIII A).

---

**8** Plaintiff also asserts the Board failed to demonstrate that its projected expenditures were "recoverable costs," as defined by section 13260, subdivision (d)(1)(C). But that subdivision does not provide an exhaustive list of recoverable costs. (§ 13260, subd. (d)(1)(C) ["[r]ecoverable costs may include, *but are not limited to*" (italics added)].) The Board is not required to tie each projected expenditure to a specific category of "recoverable costs" identified in section 13260, subdivision (d)(1)(C).

**9** We note that the Board's staff proposed an alternate fee schedule, under which the storm water permit fee would have been increased by 20 percent, rather than by 34.9 percent. The staff ultimately recommended against adopting that alternative, however, because it was not clear that the permittees who had paid the earlier fees would benefit from the reduction.

12

a. *Article XIII A*

In June 1978, voters passed Proposition 13, adding article XIII A to the state Constitution. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258 (*Jacks*).) The "initiative's purpose was to assure effective real property tax relief by means of an 'interlocking "package" ' consisting of a real property tax rate limitation (art. XIII A, § 1), a real property assessment limitation (art. XIII A, § 2), a restriction on state taxes (art. XIII A, § 3), and a restriction on local taxes (art. XIII A, § 4)." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 872 (*Sinclair Paint*).) Here, we are concerned with section 3 of article XIII A, the restriction on state taxes.

When adopted, section 3 of article XIII A provided in relevant part that "any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto . . . must be imposed by an Act passed by not less than two–thirds of all members elected to each of the two houses of the Legislature . . . ." (Former art. XIII A, § 3.) The term "tax," however, was not defined by Proposition 13. As a result, determining whether a levy was a fee or a tax became "a recurring chore" for California courts. (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 939 (*Professional Scientists*).)

In *Sinclair Paint*, *supra*, 15 Cal.4th 866, this court addressed the distinction between taxes, which require two-thirds approval, and regulatory fees, which do not. We held that article XIII A does not restrict the state's authority to impose a bona fide regulatory fee. (*Sinclair Paint*, at p. 881.) But a levy only qualifies as a regulatory fee if (1) the amount of the fee does not exceed the reasonable costs of providing the services for which it is charged, (2) the fee is not levied for unrelated revenue purposes, and (3) the amount of the fee bears a reasonable relationship to the burdens created by the feepayers' activities or operations. (*Ibid*.) If those

conditions are not met, the levy is a tax. As one appellate court explained, a "reasonable way to achieve Proposition 13's goal of tax relief is to shift the costs of controlling . . . sources of pollution from the tax-paying public to the pollution-causing industries themselves." (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist*. (1988) 203 Cal.App.3d 1132, 1148.) But the state may not charge an amount exceeding the costs it incurs because, if it were so allowed, "the imposition of fees would become a vehicle for generating revenue independent of the purpose of the fees." (*Jacks*, *supra*, 3 Cal.5th at p. 261.)

We later reaffirmed these principles in *California Farm Bureau Federation v. State Water Resources Control Bd*. (2011) 51 Cal.4th 421 (*Farm Bureau*). That case involved a statutory and regulatory scheme identical in many respects to this one. *Farm Bureau* arose out of a challenge not to storm water permit fees, but to water rights permit fees. (*Id*. at p. 429.) These fees are also set by the Board. (*Ibid*.) As with waste discharge permits, the Board was required to adopt a fee schedule for water rights permit holders. (*Id.* at pp. 431-432.) The total amount of fees was to be equal to the cost of administering the permit program, and total fee revenue was to match the revenue levels set out in the Budget Act. (*Farm Bureau*, at p. 432.) All fees were deposited in the Water Rights Fund and could only be used to carry out the work of the Water Rights Division. (*Id*. at p. 433.) Like here, the Board was authorized to adopt the fee schedule by emergency regulation. (*Id*. at pp. 433-434.) The plaintiffs alleged the statutory scheme and implementing regulations violated article XIII A on their face and as applied. (*Farm Bureau*, at p. 435.)

Whether a statute imposes a fee or a tax is a question of law to be decided upon an independent review of the record. (*Farm Bureau*, *supra*, 51 Cal.4th at p. 436, citing *Sinclair Paint*, *supra*, 15 Cal.4th at p. 874.) The plaintiff must initially establish a prima facie case that the fee is invalid. (*Farm Bureau*, at p. 436.) If

14

the plaintiff does so, the state must produce evidence showing the estimated costs of the relevant regulatory activity and the basis for determining the manner in which the costs are allocated.  (*Id*. at pp. 436-437.)  But the burden of *proof* "does not shift . . . it remains with the party who originally bears it."  (*Farm Bureau*, at p. 436, italics omitted, quoting *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1667.)  In other words, under *Farm Bureau*, even after the state had produced evidence bearing on the question, the plaintiff bore the burden of proving, as a matter of law, that the levy was an invalid tax.  (*Farm Bureau*, at p. 436.)

Applying that framework, we rejected the plaintiffs' facial challenge, reasoning that the statutory language "reveal[ed] a specific intention to avoid imposition of a tax."  (*Farm Bureau*, *supra*, 51 Cal.4th at p. 438.)  We noted that the scheme only permitted fees to cover program costs, and that all fees were deposited in the Water Rights Fund and could only be used to pay for specified activities.  (*Id*. at pp. 438-439.)  Thus, the scheme did not, on its face, violate article XIII A.  (*Farm Bureau*, at p. 437.)  We then addressed the plaintiffs' as-applied argument.  (*Id*. at p. 440.)  The plaintiffs urged that permit fees were only imposed on 40 percent of permit holders, but that fee revenues covered all of the Water Rights Division's costs.  (*Ibid*.)  The plaintiffs maintained this disparity made the fees invalid because those feepayers were shouldering a disproportionate share of the costs of the regulatory activity.  (*Ibid*.)  Because the record was insufficient to resolve the issue, we remanded the matter for findings as to whether the Board had shown "that the associated costs of the regulatory activity were reasonably related to the fees assessed on the payors."  (*Id*. at p. 442.)

In November 2010, Proposition 26 amended section 3 of article XIII A to "close perceived loopholes" in Proposition 13.[10] (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1322.) Proposition 26's findings stated that fees "couched as 'regulatory' but which exceed the reasonable costs of actual regulation or [which] are simply imposed to raise revenue for a new program and are not part of any . . . permitting program are . . . taxes and should be subject to the limitations applicable to the imposition of taxes." (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subd. (e), p. 114.)

Proposition 26 made three significant amendments. First, it modified the language of article XIII A's operative provision. The original formulation required two-thirds approval for "any changes in *State taxes* enacted for the purpose of increasing revenues." (Art. XIII A, former § 3, italics added.) The provision now reads: "Any change in *state statute which results in* any taxpayer paying a higher tax must be imposed by an act passed by not less than two–thirds of all members elected to each of the two houses of the Legislature . . . ." (Art. XIII A, § 3, subd. (a), italics added.) Second, the term "tax," as used in article XIII A, section 3, is now defined as "any levy, charge, or exaction of any kind imposed by the State," with five qualified exceptions. (Art. XIII A, § 3, subd. (b).) If a levy meets the requirements of an exception, the levy is not a tax as a matter of law. One of those exceptions is for charges "imposed for the reasonable regulatory costs to the State incident to issuing licenses and permits, performing investigations, inspections, and audits . . . and the administrative enforcement and adjudication thereof." (Art. XIII A, § 3, subd. (b)(3).) Third, Proposition 26

---

[10] Though the voters adopted Proposition 26 before this court issued its decision in *Farm Bureau*, the parties in that case did not argue that Proposition 26 applied. (*Farm Bureau*, *supra*, 51 Cal.4th at p. 428, fn. 2.)

16

shifted the burden of proof, so that the *state* now "bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Art. XIII A, § 3, subd. (d).)[11] The state, not the challenger, must now prove all facts necessary to show that a levy satisfies an exception to the definition of the term "tax."

b. *Analysis*

When the Board adopted the fee schedule in September 2011, section 3 of article XIII A provided that any "change in *state statute* which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two–thirds of all members elected to each of the two houses of the Legislature." (Art. XIII A, § 3, subd. (a), italics added.) Plaintiff does not assert there was a change in state statute that resulted in its members paying a higher tax.[12] Instead,

---

[11]    Proposition 26 also included a limited retroactivity provision, which voided "[a]ny tax adopted after January 1, 2010, but prior to the effective date of this act," if the tax had not been adopted or was not reenacted in compliance with article XIII A, section 3. (Art. XIII A, § 3, subd. (c).)

[12]    Section 13260 was enacted in 1969 (Stats. 1969, ch. 482, § 18, p. 1063), and was last amended in 2011 (Stats. 2011, ch. 2, § 28), but plaintiff does not assert that amendment resulted in higher taxes. Amici curiae California Dairy Campaign, Milk Producers Council, and Western United Dairymen, on the other hand, do assert the challenged fees were imposed by "a change in statute — the Budget Act." They reason that the Board must set permit fees at an amount equal to the revenue levels in the Budget Act. The Budget Act is a statute enacted each year which itemizes expenditures and revenues. Thus, "it is the annual change in the Budget Act that results in [plaintiff's] members and other stormwater feepayors paying an increased stormwater fee." Plaintiff never raised this argument. The general rule is " 'that an amicus curiae accepts the case as he finds it and may not "launch out upon a juridicial expedition of its own unrelated to the

17

plaintiff argues the Board's adoption of the fee schedule by emergency regulation, which it was authorized to do by section 13260, violated constitutional restrictions on regulatory fees. For its part, the Board does not argue it was free from the restraints of article XIII A in setting the fees. Instead, it urges that the burden shifting added by Proposition 26 should not apply because Proposition 26's amendments were not meant to apply retroactively, except in limited circumstances not present here. (See *ante*, p. 17, fn. 11.) The Board contends that the burden of proof framework described in *Farm Bureau* should apply.

The Court of Appeal agreed with the Board. It reasoned that plaintiff had relied on cases applying Proposition 13, which required a two-thirds vote "to impose 'any change in state taxes enacted for the purpose of increasing revenues.' (Former Cal. Const., art. XIII A, § 3.) However, Proposition 26 modified Proposition 13 [in 2010]. The current provision . . . restricts '[a]ny change in state statute which results in any taxpayer paying a higher tax . . . .' (Cal. Const., art. XIII A, § 3.) The Board's fee schedule is not a 'change in state statute,' and this constitutional provision does not apply. (See *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 423-424.) Rather than a constitutional challenge to the fee, [plaintiff's] argument is essentially that, under the case law applying the original language of Proposition 13, the Board's imposition is not a valid regulatory fee, but an illegal tax."

_____

*(footnote continued from previous page)*

actual appellate record." ' " (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1047, fn. 12, quoting *E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 510-511.) Under this rule, "California courts will not consider issues raised for the first time by an amicus curiae." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1154, fn. 7.)

Based on that reasoning, the Court of Appeal determined that Proposition 26, including its burden of proof modification, did not apply to plaintiff's action. It evaluated plaintiff's claim under the framework from *Farm Bureau*, and held that plaintiff had failed to establish a prima facie case: (1) that the amount of the waste discharge permit fees exceeded the reasonable cost of administering the permit program; and (2) that the fees were allocated in an unreasonable manner. It also held that, even if a prima facie showing had shifted the burden of *production* to the Board, the record demonstrated that the program's costs would exceed projected fee revenues and that the fees were fairly allocated.

Plaintiff argues the trial court and the Court of Appeal erred by applying *Farm Bureau*'s burden-shifting framework because, after the adoption of Proposition 26, the state bears the burden of proof in all actions challenging fees. Plaintiff then argues that the Board failed to show: (1) that the amount of the storm water permit fee did not exceed the reasonable costs of funding the storm water program area; and (2) that the fees were fairly allocated.

We agree with the Court of Appeal's conclusion, but under slightly different reasoning. The Board concedes the state Constitution limited its authority to impose these fees. Indeed, the Board admits the restrictions on regulatory fees described in *Sinclair Paint* and subsequently codified in article XIII A (as amended by Prop. 26) applied to its adoption of the fee schedule. Thus, the parties agree that the fees must not exceed the reasonable costs of the permit program, must not be levied for unrelated revenue purposes, and must be allocated in a reasonable manner. In terms of article XIII A's restrictions on the Board, the only question truly in dispute is which party bore the burden of proof.

19

Plaintiff argued in both of its trial briefs and in its opening appellate brief that the *Farm Bureau* framework should apply.[13]  Plaintiff did not raise the possibility that Proposition 26's burden of proof should apply until its appellate reply brief.  Thus, it has forfeited the argument.  (See *People v. Redd* (2010) 48 Cal.4th 691, 740.)  In any event, even if plaintiff is correct that the Board should have shouldered the burden of proof at trial, the inquiry on appeal remains the same.  Whether a government imposition is a fee or a tax is a legal question (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 874) decided on an independent review of the facts the Board is now required to prove by a preponderance of the evidence under Proposition 26.  The lower court's judgment is presumed correct and plaintiff, as the party challenging the lower court's judgment, must demonstrate as a matter of law that the permit fees were invalid taxes.  On that question, plaintiff fails to show the fee schedule violated constitutional restrictions.  Indeed, the record demonstrates that the contrary is true.

The first question under *Sinclair Paint* is whether the approved fees would exceed the reasonable, estimated costs of administering the permit program. (*Professional Scientists*, *supra*, 79 Cal.App.4th at p. 946.)  Plaintiff argues they would, pointing out that permit fee revenues were projected to increase by $27 million in fiscal year 2011-12, while fee-funded programs were not expected to increase in number or scope.  Plaintiff contends these circumstances support an inference that permit fees would exceed the reasonable costs of program activities.

Not so.  The bare fact that there is a fee increase without any growth in fee-funded programs does not mean the underlying fee schedule is invalid.  The record

---

[13]    In its reply brief to the trial court, for example, plaintiff agreed with the Board that a petitioner challenging a fee "bears the burden of proof to establish a 'prima facie case' that the fee is invalid."

demonstrates that the primary reason additional fee revenue was needed was the Legislature's decision to discontinue subsidies it had been paying to the Permit Fund. In fiscal year 2010-11, the Legislature had authorized an $18.3 million subsidy from the general fund to the Permit Fund and had separately provided $3.1 million to support the NPDES and the irrigated lands program areas. Those payments were discontinued in fiscal year 2011-12. In addition, the state ended its temporary furlough program in fiscal year 2011-12. As a consequence, Board staff projected that permit-related staffing costs would increase by approximately $6 to $8 million in that year. Combined, these actions created a substantial funding shortfall that the Board had to recover through increased fee revenues.

Plaintiff next turns its focus to the storm water permit fee, arguing that it would exceed the costs attributable to the storm water program area. This argument fails for the same reason that plaintiff's statutory argument regarding costs failed. A valid regulatory fee may not exceed the estimated costs of the relevant regulatory activity. (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 878; accord *Farm Bureau*, *supra*, 51 Cal.4th at p. 438.) Here, the relevant regulatory activity includes all eight program areas funded by the permit fees, not just the storm water program area. All of the program areas are components of the Board's broad duty to regulate parties who discharge waste. (§ 13263, subd. (a).) As noted, from fiscal year 2004-05 through fiscal year 2010-11, total program costs exceeded total permit fee revenues by $10.7 million. Moreover, for fiscal year 2011-12, estimated program costs were $101.4 million, while projected revenues were $100.7 million. Thus, the record demonstrates that fee revenues did not and would not exceed the reasonable costs of administering the entire permit program.

The second question under *Sinclair Paint* is whether the fee is used to generate *excess revenue*, that is, to generate more revenue than necessary to pay for the regulatory program. (See *Sinclair Paint*, *supra*, 15 Cal.4th at p. 876;

21

accord *Farm Bureau*, *supra*, 51 Cal.4th at p. 438 ["[w]hat a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection"].) There was no evidence that the approved fees were designed to generate excess revenue. Instead, the scheme explicitly limited fees to the amount necessary to recover the administrative costs of the permit program. (§ 13260, subd. (d)(1)(B).) Moreover, all fees are deposited in the Permit Fund and can only be spent to implement the Porter-Cologne Water Quality Control Act. (§ 13260, subd. (d)(2)(A).) The fees cannot be spent for unrelated purposes.

The final question is that of fair allocation. (*Equilon Enterprises LLC v. Board of Equalization* (2010) 189 Cal.App.4th 865, 870 (*Equilon Enterprises*).) The first two questions involve the size of the fee revenue pie. The allocation question addresses how the pie is sliced. This third question considers whether any class of feepayers is shouldering too large a portion of the associated regulatory costs. Plaintiff argues the fees were not fairly allocated because storm water permit fee payers had historically paid more than the costs of the storm water program area, while payers of the other seven permit fees had historically paid less than their program area costs. In other words, plaintiff argues that storm water permit holders had been subsidizing costs that should have been borne by holders of the other seven permits. The Court of Appeal held plaintiff failed to make a prima facie case. We agree.

The record demonstrates that permit fees were reasonably allocated among fee payers. A "regulatory fee, to survive as a fee, does not require a precise cost-fee ratio." (*Professional Scientists*, *supra*, 79 Cal.App.4th at p. 950.) Fees must bear a fair or reasonable relationship to the fee payers' burdens on or benefits from the regulatory activity. (*Farm Bureau*, *supra*, 51 Cal.4th at p. 437.) But "[r]egulatory fees, unlike other types of user fees, often are not easily correlated to a specific, ascertainable cost." (*Professional Scientists*, at p. 950; accord *Moore v.*

22

*City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368.)  As a consequence, an "inherent component of reasonableness in this context is flexibility." (*Equilon Enterprises*, *supra*, 189 Cal.App.4th at p. 883; accord *Farm Bureau*, at p. 442.)  So long as "there is a reasonable basis in the record for the manner in which the fee is allocated among those responsible for paying it," a regulatory fee will not be deemed an unconstitutional tax under article XIII A.  (*Equilon Enterprises*, at p. 870*;* see also *Professional Scientists*, at p. 950.)

From fiscal year 2004-05 through fiscal year 2010-11, 23 percent of all program area expenditures were attributable to the storm water program area.[14]  For fiscal year 2011-12, 26 percent of all permit fee revenues were projected to come from storm water permit fees.[15]  Thus, there is a 3 percentage point difference between the percentage of costs historically attributable to the storm water program area and the percentage of fees to be collected from storm water permit fee payers.  Given the imprecise nature of projecting future permit fee revenues and expenditures, this difference is reasonable and passes muster under the flexible standard that applies to regulatory fees.

Moreover, we note that the gap between storm water permit fee revenues and storm water program area expenses had narrowed in the years leading up to this action.  In fiscal years 2004-05, 2005-06, and 2006-07, permit fee revenues exceeded program area expenses by $5.2 million, $4.8 million, and $4.7 million, respectively.  In fiscal year 2010-11, the year immediately preceding plaintiff's

---

[14]  Total waste discharge permit program expenditures for fiscal years 2004-05 through 2010-11 were $481 million.  Storm water program area expenditures for those seven fiscal years were $111 million.

[15]  The staff report projected that the fee schedule would generate $100.7 million in waste discharge permit fees for fiscal year 2011-12 and that $26.6 million of that amount would come from storm water permit fees.

23

challenge, storm water permit fee revenues exceeded storm water program area expenses by only $1.1 million. On this record, taking into account the imprecision inherent in predictions, there is insufficient evidence to support a finding that the Board employed a faulty methodology to allocate fees or intended to subsidize other program areas with storm water permit fee revenues.

In challenging the allocation of permit fees, plaintiff relies on *Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493 (*Capistrano*). But that case is distinguishable. It involved a water district's tiered rate structure, which was imposed on property owners and increased progressively in relation to usage. (*Capistrano*, at pp. 1499-1501.) The Court of Appeal concluded the district had failed to show its property-related fees did not exceed the cost of services attributable to each parcel. (*Id.* at pp. 1506-1508.)

As to allocation, the restrictions on property-related fees in article XIII D of the state Constitution are different from those imposed on regulatory fees by article XIII A. Article XIII D provides that the amount of a property-related fee "shall not exceed the proportional cost of the service attributable to the parcel." (Cal. Const., art. XIII D, § 6, subd. (b)(3).) In *Capistrano*, the water district conceded that its tiered pricing did not reflect increased costs and that it "effectively used revenues from the top tiers to subsidize below-cost rates for the bottom tier." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499.) Under article XIII A, all that is required is that the record demonstrate a reasonable basis for the manner in which the fee is allocated among those who pay it. (*Equilon Enterprises*, *supra*, 189 Cal.App.4th at p. 870.) The Court of Appeal's reasoning in *Capistrano* does not compel a different conclusion under article XIII A.

### III.  DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**O'ROURKE, J. \***

_____

\*        Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Building Industry Association v. State Water Resources Control Board
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 235 Cal.App.4th 1430
**Rehearing Granted**

_____

**Opinion No.** S226753
**Date Filed:** May 7, 2018

_____

**Court:** Superior
**County:** San Francisco
**Judge:** Curtis E. A. Karnow

_____

**Counsel:**

Rutan & Tucker and David P. Lanferman for Plaintiff and Appellant.

Somach Simmons & Dunn, Theresa A. Dunham and Daniel Kelly for The California Dairy Campaign, The Milk Producers Council and Western United Dairymen as Amici Curiae on behalf of Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Paul D. Gifford, Robert W. Byrne and Diane Spencer Shaw, Assistant Attorneys General, Gavin G. McGabe, Molly K. Mosley, Robert E. Asperger and Tiffany Yee, Deputy Attorneys General, for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David P. Lanferman
Rutan & Tucker
Five Palo Alto Square
3000 El Camino Real, Suite 200
Palo Alto, CA  94306-9814
(650) 320-1500

Robert E. Asperger
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 327-7852