# IN THE SUPREME COURT OF CALIFORNIA

ALLIED PREMIER INSURANCE,
Plaintiff and Respondent,

v.

UNITED FINANCIAL CASUALTY COMPANY,
Defendant and Appellant.

S267746

Ninth Circuit
20-55099

Central District of California
No. 5:18-cv-00088-JGB-KK

_____

July 24, 2023

_____

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

ALLIED PREMIER INSURANCE v. UNITED FINANCIAL
CASUALTY COMPANY

S267746

Opinion of the Court by Corrigan, J.

The United States Court of Appeals for the Ninth Circuit has certified[1] the following question for our review:  Under California's Motor Carriers of Property Permit Act (Veh. Code, § 34600 et seq.; the Act),[2] does a commercial automobile insurance policy continue in full force and effect until the insurer cancels the corresponding Certificate of Insurance on file with the Department of Motor Vehicles (DMV or Department), regardless of the insurance policy's stated expiration date?  The answer is no.  The terms of an insurance contract generally determine the duration of the policy's coverage.  Although an endorsement can amend the policy, neither the Act nor the specific endorsement it requires extend coverage beyond the underlying policy's expiration date.

In *Transamerica Ins. Co. v. Tab Transportation, Inc.* (1995) 12 Cal.4th 389 (*Transamerica*), this court interpreted an earlier permitting system codified in the Public Utilities Code. We held that the policy endorsement required by that scheme did extend insurance coverage until notice of cancellation was provided to the Public Utilities Commission.  However, the language in the Public Utilities Code, on which we relied in

_____

[1]   California Rules of Court, rule 8.548.

[2]   All undesignated statutory references are to the Vehicle Code.

1

*Transamerica,* was not carried over when later legislation
replaced the Public Utilities Code permitting scheme and
amended the Vehicle Code to add the Act at issue here. As a
result, *Transamerica*'s holding does not control the answer to
the certified question.

## I. BACKGROUND

The facts are taken from the parties' joint stipulation of
facts and exhibits as well as the judgment of the United States
District Court, Central District of California.

### A. The Act

Commercial trucker Jose Porras is a " 'motor carrier of
property' " (motor carrier or carrier). (§ 34601, subd. (a).) Under
the Act, a motor carrier cannot operate on public highways
without securing a DMV permit, which requires proof of the
carrier's financial responsibility. (§§ 34620, subd. (a), 34630,
subd. (a).) A carrier can satisfy that requirement by obtaining
a policy of insurance.[3] (§ 34631.) If a carrier does so, the insurer
must submit a certificate of insurance to the Department as
evidence that the "protection required under [section 34631.5,]
subdivision (a)" is provided. (§ 34631.5, subd. (b)(1).)

---

[3]     Section 34631.5, subdivision (a), establishes the required
minimum amount of liability protection for bodily injury, death,
and property damage. (§ 34631.5, subd. (a)(1)–(4).) The proof of
financial responsibility required under section 34630 must "be
evidenced by the deposit with the [DMV], covering each vehicle
used or to be used under the motor carrier permit . . . , of one of
the following": (1) a certificate of insurance issued by an
insurance company; (2) a surety bond issued by a company
licensed to write surety bonds in the state; (3) evidence of
qualification as a self-insurer; or (4) evidence that coverage is
provided by a charitable risk pool. (§ 34631, subds. (a)–(d).)

The Department has published forms to facilitate the administration of the Act's financial responsibility requirement. Two of those forms are a "Certificate of Insurance" and an "Insurance Policy Endorsement." (See Cal. Code Regs., tit. 13, § 220.06, subds. (a), (b).) When a motor carrier complies with the Act by obtaining an insurance policy, a DMV regulation requires that the "Insurance Policy Endorsement . . . , amending the insurance policy to comply with insurance requirements imposed by the [Act], . . . be attached to and made part of, the insurance policy insuring the motor carrier." (Cal. Code Regs., tit. 13, § 220.06, subd. (b).)

The Act requires that "proof of financial responsibility . . . be continued in effect during the active life" of the permit issued to the motor carrier. (§ 34630, subd. (b).) This requirement prohibits cancellation of a certificate of insurance without notice to the DMV by the insurer.[4] (*Ibid*.) When an insurer gives notice that a certificate will be cancelled because the policy will lapse or be terminated, the DMV must "suspend the carrier's permit effective on the date of lapse or termination

---

[4]    To effectuate this requirement and prohibition, the Act requires that "[e]very insurance certificate or equivalent protection to the public . . . contain a provision that the certificate or equivalent protection shall remain in full force and effect until canceled in the manner provided by [section 34631.5, subdivision (b)(3)]." (§ 34631.5, subd. (b)(4).) Section 34631.5, subdivision (b)(3) provides that a certificate of insurance "shall not be cancelable on less than 30 days' written notice to the [DMV]." California Code of Regulations, title 13, section 220.06, subdivision (c) provides that "[w]ritten notice of cancellation of [a] Certificate of Insurance, required under [section 34630, subdivision (b)], shall be submitted by the insurer to the department on a Notice of Cancellation of Insurance." This form is referred to herein as a cancellation notice.

unless the carrier provides evidence of valid insurance coverage" pursuant to section 34630, subdivision (a). (§ 34630, subd. (c).) This procedure ensures that only financially responsible carriers are permitted to operate on public highways.

### B. The Facts

Effective May 2, 2013, United Financial Casualty Company (United) began insuring Porras under a commercial automobile insurance policy with an eight-digit policy number ending in 772 (the United policy or Policy 772). The policy provided that, in return for Porras's premium payment, United would, up to the policy limit, pay specified damages Porras became responsible for as a result of an accident "arising out of the ownership, maintenance or use of" an insured vehicle. The policy also provided that United would, at its option, settle or defend any covered claim and that, if Porras failed to pay the premium to renew, the policy would "automatically terminate at the end of the current policy period."

As required by the Act, United filed a certificate of insurance, identifying United as the insurer and Porras as the insured and giving the policy number ending in 772. United certified that a "fully executed endorsement, on a form authorized by the [DMV], is attached to the referenced policy to conform to the requirements of the [Act]" and that "[t]his Certificate . . . shall not be canceled on less than thirty (30) days notice from the Insurer to the DMV and written on a Notice of Cancellation form authorized by the DMV."

United attached the required Insurance Policy Endorsement to the United policy (the Endorsement). Under the Endorsement, United agreed: (1) to "pay, consistent with the minimum insurance coverage required by [section] 34631.5

4

. . . any legal liability of insured for bodily injury, death, or property damage arising out of the operation, maintenance, or use of any vehicle(s) for which a motor carrier permit is required"; (2) that "[n]o provision, stipulation, or limitation contained in the attached policy or any endorsement shall relieve insurer from obligations arising out of this Endorsement or the Act, regardless of the insured's financial solvency, indebtedness[,] or bankruptcy"; (3) that the "Certificate of Insurance shall not be canceled on less than thirty (30) days notice from the Insurer to the DMV"; and (4) that, "[e]xcept as specified in this endorsement, the terms, conditions, and limitations of this policy remain in full force and effect." [5] One of the terms in the policy was the termination date. The Endorsement also permitted United to seek "reimbursement from [Porras] for any payment made by [United] solely on account of the [Endorsement's] provisions."

United provided coverage for Porras through the original or renewed Policy 772 from May 2, 2013 through April 12, 2015. During that period, it appears that United filed at least three certificates of insurance and two cancellation notices, one of which the Department returned to United as an "incomplete filing." It appears that, as the end of a policy period approached, United would file a cancellation notice with the DMV, noting the policy number and giving the date the policy would lapse. The timing of the notice made the DMV aware that, if Policy 772 was not renewed, it would lapse on the date provided, triggering the DMV's duty to suspend Porras's operating permit. If the policy

---

[5]     Unlike the policy, the "coverage provided by the endorsement exclude[d] any costs of defense or other expense that the policy provides."

was subsequently renewed, United would send a new certificate of insurance as evidence that Porras continued to have the required protection under Policy 772. The new certificate would indicate the date on which the new policy period began. As noted, one of United's cancellation notices was rejected by the Department as an incomplete filing. After that filing was returned, however, United filed a new certificate of insurance, covering the ensuing period. As relevant here, United submitted its final cancellation notice on February 6, 2015, informing the Department that "the [United] policy, including applicable endorsement and certifications" is cancelled "effective thirty (30) days after the date" it was either received by the DMV, or on April 12, 2015, whichever was later. Every certificate and cancellation notice in the record bears both the 772 policy number and the number of Porras's permit.

By April 12, 2015, Porras had not paid the premium required to renew the United policy. Effective April 13, 2015, Allied Premier Insurance (Allied) began to insure Porras under a policy that provided the required coverage. Allied submitted a certificate of insurance to the Department four days later. The record contains no indication that, when it assumed coverage and filed its own certificate, Allied was aware that United's earlier certificate remained uncancelled because the DMV had rejected United's cancellation notice.

On September 1, 2015, Porras was driving a truck covered by the Allied policy when he collided with a car driven by Jennifer Jones. Jones died as a result of the accident, and her parents sued Porras for wrongful death. Porras tendered his defense to Allied, which retained counsel to defend him and settled the parents' claim for its policy limits of $1 million.

United was not a party to the Jones suit, did not defend Porras in that action, and did not contribute to the settlement.

### C. The Action at Issue Here

After the settlement, Allied sued United for declaratory relief, equitable contribution, and equitable subrogation, seeking reimbursement for half the amount it paid to resolve the Jones litigation. It argued that, because one of United's cancellation notices was rejected by the Department as incomplete, United continued to have an active certificate of insurance on file with the DMV. That circumstance, according to Allied, meant United's policy remained in effect on the date of the collision between Porras and Jones.

United urged that it had no obligation to reimburse Allied because its policy had expired when Porras failed to renew. United acknowledged one of its certificates of insurance remained on file with the DMV because a cancellation notice had been returned. However, it argued the certificate was not an insurance policy. At most, it created a surety-like obligation, providing a "safety net" for members of the public injured by commercial motor carriers. Because the certificate of insurance did not function to make United a co-insurer of Porras, United argued it was not required to contribute to the settlement.

The case was removed to federal court. The parties filed a joint stipulation of facts and exhibits and then filed cross-motions for summary judgment. The district court ruled for Allied, finding that, because United "failed properly to submit a Notice of Cancellation, its policy remained in effect" on the date of the accident, "even though [the policy] may have lapsed under its own terms or been cancelled by the parties." Based on that finding, the court concluded that Allied and United both

provided "insurance coverage on the same risk," and that Allied was "entitled to equitable contribution in the amount of $500,000."[6]

United appealed to the Ninth Circuit, which certified the question of law to this court. (*Allied Premier Ins. v. United Financial Cas. Co.* (9th Cir. 2021) 991 F.3d 1070, 1071.) In the Ninth Circuit's view, the appeal turns on the following question of statutory interpretation: "If the [Act] requires a commercial auto insurance policy to remain in effect indefinitely until the insurer cancels the certificate of insurance on file with the DMV, then Allied must prevail. If not, United must prevail." (*Id.* at p. 1073.) We hold that the Act does not require the policy to remain in effect indefinitely.

## II. DISCUSSION

Equitable contribution is the "right to recover, not from the party *primarily* liable for the loss [here, Porras], but from a *co-obligor* who *shares* such liability with the party seeking contribution [here, United]." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 (*Fireman's Fund*).) "In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action

---

[6] The district court also addressed and rejected United's argument that a certificate of insurance that "remains on record after a policy lapses functions as a surety, through which the insurer 'promises to pay up to $750,000 towards a judgment against the trucker [for harm to a third party] where coverage for some reason is unavailable under an actual insurance policy.'" The Ninth Circuit has not asked us to assess the propriety of that ruling, and we express no view on it.

without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk." (*Ibid.*)

The "reciprocal contribution rights of coinsurers who insure the same risk are based on the equitable principle that the burden of indemnifying or defending the insured with whom each has independently contracted should be borne by all the insurance carriers together, with the loss equitably distributed among those who share liability for it in direct ratio to the proportion each insurer's coverage bears to the total coverage provided by all the insurance policies." (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1294.) The right to equitable contribution "is predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the . . . choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor." (*Id*. at p. 1295.)

"Equitable contribution thus *assumes the existence of two or more valid contracts of insurance covering the particular risk of loss and the particular casualty in question.*" (*Fireman's*

*Fund*, *supra*, 65 Cal.App.4th at p. 1295, italics added.) This assumption lies at the heart of the Ninth Circuit's question. Allied's entitlement to equitable contribution depends on whether United was obligated to indemnify Porras for any damages due to the Jones accident. Allied is entitled to equitable contribution only if it can show that United was a "*co-obligor* who *shares . . .* liability" with Allied for the loss resulting from that event. (*Id.* at p. 1293.) Allied must show that United was "obligated to indemnify or defend the same loss or claim" as Allied. (*Ibid.*) Resolution of this question turns on an interpretation of the Act's requirements.

### A. *The Act Does Not Extend the Policy Beyond the Term Contained in the Contract*

As mentioned, the district court concluded that the United policy's coverage remained in effect, not based on the policy's terms, but because United had not cancelled all certificates of insurance on file with the DMV. The court relied on *Transamerica*, *supra*, 12 Cal.4th 389 in reaching that conclusion. *Transamerica* does not control here because it interpreted a different statutory scheme.

*Transamerica* addressed the application of the Act's predecessor, the Highway Carriers' Act of 1951 (Pub. Util. Code, former § 3501 et seq.; HCA). The Legislature repealed the HCA in 1996 and replaced it with the Act, transferring primary regulatory authority over commercial truckers to the DMV. (See *Hill Brothers Chemical Co. v. Superior Court* (2004) 123 Cal.App.4th 1001, 1005; see also Stats. 1996, ch. 1042, § 53, p. 6562.) Like the Act that replaced it, the HCA prohibited commercial truckers from operating on public highways without a permit issued by the Public Utilities Commission (PUC). To

obtain a permit, a commercial trucker had to show it carried
" 'adequate protection' against liability." (*Transamerica*, *supra*,
12 Cal.4th at p. 397, fn. omitted.)  This could "be achieved by
means of an insurance policy, a surety bond, or evidence . . . of
the carrier's qualification as a self-insurer." (*Ibid*.)  Proof of
insurance coverage could be submitted to the PUC "in the form
of 'a certificate of insurance.' " (*Id*. at p. 398.)

As to cancellation of a policy, the HCA provided that
" 'protection against liability shall be continued in effect during
the active life of the [trucker's] permit,' and that '[t]he policy of
insurance or surety bond shall not be cancelable on less than 30
days' written notice to the [PUC], except in the event of cessation
of operations as a highway carrier as approved by the [PUC].' "
(*Transamerica*, *supra*, 12 Cal.4th at p. 398, quoting Pub. Util.
Code, former § 3634, italics omitted.)  To promote the continuous
protection requirement and prohibition on cancellation without
notice, the PUC promulgated General Order No. 100, which
required the following provisions to be included in any policy
subject to the HCA:  (1) " 'A *policy* of insurance, or surety bond,
evidencing such protection, shall not be cancelable on less than
thirty (30) days' written notice to the Public Utilities
Commission' "; and (2) " '*Every insurance policy*, surety bond or
equivalent protection to the public shall contain a provision that
such policy, surety bond or equivalent protection *will remain in
full force and effect until canceled in the manner provided*' " by
the General Order. (*Transamerica*, at p. 398, italics added.)  The
regulatory scheme also required "a standard PUC form
endorsement" be "attached to every policy of insurance
purchased by a highway carrier." (*Id*. at pp. 394, 398.)  The
endorsement certified "that a liability *policy* issued to a highway

11

carrier [would] continue 'in full force and effect until canceled' "
by written notice to the PUC.  (*Id*. at p. 394, italics added.)

The dispute in *Transamerica* was between a commercial
trucking company (Tab) and its liability insurer (Transamerica).
In 1980, Tab purchased a one-year term liability insurance
policy from Transamerica to comply with the HCA.
(*Transamerica*, *supra*, 12 Cal.4th at p. 395.)  Transamerica filed
a certificate of insurance with the PUC.  The certificate provided
that the "policy was 'Effective 2-1-80 Until Canceled.' "  (*Ibid*.)
Tab did not renew the Transamerica policy and, in the ensuing
years, obtained insurance policies from Federal Insurance
Company (Federal) and Home Indemnity Company (Home).
(*Ibid*.)  Both Federal and Home filed certificates of insurance
representing their policies with the PUC.  (*Ibid*.)  However,
"neither Transamerica nor Tab ever notified the PUC of the
cancelation of the Transamerica policy."  (*Ibid*., fn. omitted.)

In 1989, a Tab truck collided with a train, causing multiple
injuries and deaths.  (*Transamerica*, *supra*, 12 Cal.4th at p.
395.)  The plaintiffs sued Tab for various claims and sought $6
million in damages.  (*Id*. at p. 396.)  Tab demanded coverage
from Transamerica, Federal, and Home under the three policies
mentioned above.  (*Ibid*.)  Federal and Home "each contributed
[their] policy limits (a total of $1.6 million) to a global settlement
in which Tab admitted liability."  (*Ibid*.)  Transamerica did not
participate in the settlement.  (*Ibid*.)

Transamerica then sued Tab, seeking a declaratory
judgment that it was not liable for damages from the 1989
collision because its policy had previously expired.
(*Transamerica*, *supra*, 12 Cal.4th at p. 396.)  Tab cross-
complained, asserting entitlement to coverage under the policy

because the certificate of insurance Transamerica filed with the PUC "expressly stated its policy was 'Effective 2-1-80 Until Canceled.' " (*Ibid*.) Because Transamerica never notified the PUC that its policy was canceled, Tab argued the policy "continued in effect." (*Ibid*.) The trial court granted Tab's motion for summary adjudication of the coverage issue. Transamerica appealed, and the Court of Appeal reversed, concluding that the Transamerica policy had "expired of its own terms [in] 1981, and that Transamerica therefore had no obligation to give 30 days' written notice to the PUC of its intent to cancel the policy." (*Id*. at pp. 396–397.)

On review, this Court reversed the Court of Appeal's judgment and concluded that Transamerica's policy was still "in effect at the time of the 1989 accident, thus providing coverage for Tab." (*Transamerica, supra*, 12 Cal.4th at p. 400.) We reasoned that the "policy must be read in light of its original provisions as well as those added to the policy by the PUC's standard form endorsement." (*Id*. at p. 399.) We then described the policy and endorsement as follows: "As initially written, the Transamerica policy was to remain in effect for one year only, from February 1, 1980, until February 1, 1981. But . . . the policy was amended by the standard PUC endorsement, which provides for inclusion in the policy of the PUC's General Order No. 100 . . . . [¶] Incorporation of General Order No. 100 . . . into the provisions of the Transamerica policy added to the provisions the requirement . . . that 'such policy . . . will remain in full force and effect until canceled . . . .' This language, of course, is in direct conflict with the language of the policy as originally written stating that the policy was to expire in February 1981." (*Id*. at pp. 399–400.) We concluded that "incorporation into the policy of the PUC's General Order No.

100 language requiring the policy to remain in 'full force and effect until canceled' converted the policy from a one-year term policy to a policy that was to remain in effect 'until canceled.' " (*Id.* at p. 400.) It was undisputed that there was "no compliance with the notice requirements" in former section 3634 of the Public Utilities Code and General Order No. 100. Therefore, we held that the policy was "still in effect" at the time of the 1989 collision. (*Transamerica*, at p. 400.)

Under its terms, the HCA provided that " '*protection against liability* shall be continued in effect during the active life of the permit,' and that '[t]he *policy of insurance* or surety bond shall not be cancelable on less than 30 days' written notice to the [PUC], except in the event of cessation of operations as a highway carrier as approved by the [PUC].' " (*Transamerica, supra,* 12 Cal.4th at p. 398, quoting Pub. Util. Code, former § 3634, original italics omitted, italics added.) So, the terms of the HCA required that protection against liability, which was provided by the policy, remain in effect until the motor carrier's *permit* was cancelled. To effectuate that requirement, the HCA and the required endorsement prohibited the *policy* from being cancelled without notice.

The Act is different. It provides that "*[p]roof of financial responsibility* shall be continued in effect during the active life of the motor carrier permit," and that the "*certificate of insurance* shall not be cancellable on less than 30 days' written notice from the insurer to the [DMV] except in the event of cessation of operations as a permitted motor carrier of property." (§ 34630, subd. (b), italics added.) Likewise, section 34631.5, subdivision (b)(3) provides that the certificate of insurance, "evidencing the protection, shall not be cancelable on less than 30 days' written notice" to the DMV. Thus, while the HCA

specifically prohibited cancellation of an insurance *policy* without notice, the Act only prohibits cancellation of a *certificate of insurance* without notice. This prohibition helps to ensure that "proof of financial responsibility" remains "in effect during the active life" of the permit. (§ 34630, subd. (b).)

The difference in statutory language is significant. Under the HCA and the endorsement required by General Order No. 100, the underlying *policy* could not be cancelled without notice to the PUC. As a result, Transamerica remained obligated. Its policy with Tab had been amended by the endorsement, which "converted the policy from a one-year term policy to a policy that was to remain in effect 'until canceled.' " (*Transamerica, supra*, 12 Cal.4th at p. 400.) But under the new language of the Act only the certificate of insurance remains active until cancelled. Cancellation of a certificate triggers the DMV's obligation to suspend the motor carrier's permit. The statute does not say that the underlying policy remains active beyond the period called for in the contract between the parties. There is no language that "converts" the stated term of the policy.

*Transamerica* was decided against the backdrop of a general rule that an insurance company "incurs no liability for an accident that occurs after the policy period has ended." (*Transamerica, supra*, 12 Cal.4th at p. 394.) This Court concluded in *Transamerica* that the HCA created an exception to that general rule. The *coverage* provided by an insurance policy subject to the HCA could not be canceled, regardless of its stated expiration date, without written notice of the policy's cancellation to the PUC. (*Transamerica*, at p. 401.) This exception was based on explicit statutory language in the HCA prohibiting cancellation of a " 'policy of insurance, or surety

bond' " without notice to the PUC. (*Transamerica*, at p. 398, quoting Pub. Util. Code, former § 3634.)

That language was not carried over into the Act. The change does not appear inadvertent. Like the HCA, an early draft of the Act would have conditioned a motor carrier's "[r]egistration" with the Department on the filing of either "a policy of insurance," a surety bond, or other evidence of insurance. (Assem. Bill 1683 (1995–96 Reg. Sess.) § 55, as amended Aug. 30, 1995.) The same draft would have required that "protection against liability . . . be continued in effect during the active life of the registration." (*Ibid*.) In later drafts, that language was removed from the relevant provisions and replaced with requirements that: (1) a "certificate of insurance" be filed with the Department; and (2) "proof of financial responsibility . . . be continued in effect during the active life of the permit." (Assem. Bill 1683 (1995-96 Reg. Sess.) § 53, as amended July 7, 1996.) These were the requirements the Legislature ultimately approved. (§ 34630, subds. (a), (b).)

We generally infer a change in meaning from a change in statutory language. An " 'essential change in the phraseology of a statutory provision would indicate an intention on the part of the legislature to change the meaning of such provision rather than interpret it.' " (*Estate of Todd* (1941) 17 Cal.2d 270, 274–275.) This is especially true if a court has construed the old statute as having a particular meaning. (See *Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1557 (*Benson*).) As *O'Brien v. Dudenhoeffer* (1993) 16 Cal.App.4th 327 explained, an "amendment materially changing a statute following a court decision interpreting the statute in its original form is to be regarded as an indication of legislative intent to change the meaning of the law." (*Id*. at p. 335.) We should

therefore "reject an interpretation of the statute which would leave the prior judicial construction in effect." (*Ibid*.)

The Act prohibits cancellation of a certificate of insurance without notice to the DMV. (§ 34630, subd. (b); § 34631.5, subd. (b)(3).) Unlike the HCA, it does not speak to cancellation or termination of the underlying policy, which embodies the agreement between the parties. As a result, the Act does not prevent cancellation or termination of an insurance policy under the terms of the contract.

It is undisputed that at least one certificate of insurance that United filed during the period it covered Porras remained uncancelled at the time of the accident. The question remains: What impact does a certificate of insurance remaining on file with the DMV have with respect to the coverage that an insurer owes to its insured? Again, we return to the language of the United policy, the certificate of insurance, and the endorsement.

### B. The Effect Upon Coverage of the Certificate of Insurance and the Required Endorsement

Insurance coverage is generally understood to mean an obligation on the insurer "to defend and indemnify the insured against loss resulting from specified activities." (2 Witkin, Summary of Cal. Law (11th ed. 2017) Insurance, § 210, p. 329.) The certificate of insurance required by the Act mentions neither of these obligations. They are, instead, imposed by the terms of the United policy and by the Endorsement, though the obligations are described differently in each document.

In its certificates of insurance, United affirmed that Porras was covered by Policy 772, that the policy covered all vehicles for which Porras's permit was required, and that a fully executed endorsement was attached to the policy. It also agreed

17

the certificate was not cancellable without 30 days' written notice to the Department.

The United policy promised that, if Porras "pa[id] the premium for liability coverage for the insured auto involved," then United would pay damages up to the policy limits. The policy also provided that United would "settle or defend, at [its] option, any [covered] claim or lawsuit for damages." Thus, so long as Porras paid the required premium, the policy required United to (1) defend or settle any covered claim against Porras and (2) indemnify Porras for any damages, up to the limits of liability. If Porras did not pay the required premium, however, the policy would "automatically terminate at the end of the current policy period."

The Endorsement also addressed United's duties to defend and indemnify Porras, but it altered some of the obligations United and Porras owed to each other under the terms of the underlying policy. In the Endorsement, United promised to "pay, consistent with the minimum insurance coverage required by [section 34631.5], and consistent with the limits it provides herein, any legal liability of [Porras] for bodily injury, death, or property damage arising out of the operation, maintenance, or use of any vehicle(s) for which a motor carrier permit is required." United also promised that "[n]o provision, stipulation, or limitation contained in the attached policy or any endorsement [would] relieve [United] from obligations arising out of this Endorsement or the Act, regardless of insured's financial solvency, indebtedness or bankruptcy." However, the Endorsement's "coverage" excluded any "costs of defense or other expense that the policy provide[d]." And the Endorsement specifically stated that it did "not prevent [United] from seeking reimbursement from [Porras] for any payment made by [United]

solely on account of the [Endorsement's] provisions." Thus, the
Endorsement promised that United would pay Porras's legal
liability up to the statutorily required minimum amount
notwithstanding any provision or limitation in the policy. But
it also allowed United to seek reimbursement from Porras for
any payment United made *solely* on account of its provisions,
and it specifically excluded the costs of Porras's defense from its
coverage. More importantly for our purposes, the Endorsement
was an amendment to the United policy. Unlike the HCA and
the endorsement applying General Order No. 100 in
*Transamerica*, nothing in the Act or the Endorsement provides
that the *policy* must remain effective until cancellation of the
certificate of insurance.

We emphasize that the question before us is a narrow one.
We hold that an uncancelled certificate of insurance that
remains on file with the DMV does not cause the corresponding
insurance policy to remain in effect in perpetuity. But that is
not to say that an uncancelled certificate of insurance imposes
no obligation of any kind on the responsible insurer. The
statutory scheme suggests otherwise. For example, section
34631.5, subdivision (d) provides that "[e]very insurance
certificate or equivalent protection to the public shall contain a
provision that the certificate or equivalent protection shall
remain in full force and effect until canceled." Further, under
the Act, an insurer remains obligated to promptly notify the
DMV at least 30 days before a certificate of insurance is
cancelled. This obligation is an important part of the statutory
scheme, alerting the DMV of the need to suspend a motor
carrier's permit until new insurance coverage is acquired.

United has suggested in the federal litigation, and before
this court, that an uncancelled certificate of insurance could

impose on the insurer something akin to a surety obligation to members of the public. The Ninth Circuit has not asked us to, and we need not, resolve whether such an obligation is created and the scope of any such obligation. We express no opinion on those questions. The character, nature, and extent of the obligations owed by a company that does not properly cancel a certificate of insurance are matters that can be clarified by further litigation and/or legislative action.

### C. Allied's Counterarguments Fail

In Allied's view, the coverage provided by an insurance policy subject to the Act cannot lapse or be canceled until the insurer files a cancellation notice with the DMV. Indeed, Allied's primary argument is that the insurance policy, the endorsement, and the certificate of insurance are all inseparable parts of a single whole, none of which can exist or be canceled without an effect on the others.

In support of this position, Allied points to section 34630, subdivision (a), which refers to "the policy represented by the certificate," and section 34631.5, subdivision (b)(1), which refers to the certificate of insurance as "evidence[]" of the "protection required" by the Act. Allied contends that, because the certificate is evidence of and "represents the policy," it "cannot exist without an underlying policy." Allied argues that "even if the policy . . . is set to expire on a certain date, the [certificate] and the policy it represents will remain in effect until 30 days after written notice is given to the DMV."

Allied also relies on language in the certificate of insurance, in which United certified under penalty of perjury that Porras "is covered" by the United policy. Allied urges the use of the verb "is" means that the policy *must* remain active

until the certificate is canceled. According to Allied, if a policy can be canceled while the corresponding certificate remains active, then the insurer would be subject to penalties for perjury. Allied argues the certificate would become "a hollow document" that "would certify a falsehood — i.e. that there is insurance available." To support its position that the policy and the endorsement are inseparable, Allied relies on language in the Endorsement providing that it is "attached to and made a part of" the United policy. Finally, Allied points to the cancellation notice, urging that it provides notice of cancellation of all three documents: policy; certificate; and endorsement. Allied argues there is "no separate mechanism for canceling only one or two of the three . . . . [E]ither all are active or all are canceled."

There is, of course, a linkage between an insurance policy subject to the Act, the certificate of insurance required by the Act, and the endorsement required by the DMV's regulations. But the documents are not one and the same. Rather, each serves its own function within the regulatory framework. As explained, an insurance policy is an agreement between an insurer and its insured. If a motor carrier complies with the Act by obtaining insurance, the certificate is evidence tendered to the DMV that the insurer agrees to be bound by the terms of the endorsement and therefore provides sufficient protection to satisfy the Act's financial responsibility requirements. The certificate thus demonstrates the carrier's financial responsibility by virtue of its contractual arrangement with the insurer. It is the document that supports issuance of the carrier's permit, and its cancellation triggers the Department's duty to suspend that permit. The certificate, however, does not govern the obligations between the parties. The endorsement, meanwhile, serves to ensure that the policy complies with the

Act's financial responsibility requirements and amends the policy to the extent of the endorsement's terms.

Allied's argument, that an insurer might be subject to a perjury charge for failing to cancel a certificate of insurance when a policy expires, raises an interesting potentiality, but it does not establish that the certificate, the policy, and the endorsement are inseparable or cannot exist without one another. Indeed, the premise that the three documents are indivisible is flawed. On the contrary, a carrier can contract for coverage with an insurer, and that coverage can become legally binding on the parties without any endorsement and before any certificate is filed. The fact a certificate "remains on file" with the DMV does not act to extend the policy's coverage beyond its expiration date. As for the Endorsement, its language clearly indicates that the nature of coverage it describes is different from that provided by the policy. The Endorsement amended the policy in several ways. If applicable, it would impose no duty to defend, and it would allow United to seek reimbursement from Porras under certain circumstances. But, unlike the endorsement in *Transamerica, supra*, 12 Cal.4th 389, it did not change the duration of coverage, a subject to which it did not speak. Therefore, the Endorsement did not convert the policy from one with an agreed-upon term to one which remained in effect until cancelled.

Next, Allied argues there is no indication that the Legislature intended "to modify the financial responsibility requirements for motor carriers" or to change the rule from *Transamerica, supra*, 12 Cal.4th 389. Rather, the Legislature's purpose in passing the Act, according to Allied, was to conform state law to a newly enacted federal law that preempted parts of the HCA. Allied points out that neither the Act nor its

22

legislative history singles out *Transamerica* for "disapproval." According to Allied, the change in statutory language was simply based on a change in the documentation required to be filed with the Department.[7]

In construing a statute, we consider first the words of the statute as the most reliable indicator of legislative intent. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.) Here, the HCA previously prohibited cancellation of an insurance policy without notice to the PUC. In the Act, that prohibition has been removed and replaced with a prohibition on the cancellation of a certificate of insurance without notice to the DMV. If the Legislature intended to perpetuate *Transamerica*'s holding, relating to the continuation of the underlying policy itself, it could have simply used the same language it used in the HCA. Allied cites no authority for the proposition that the rule from *Transamerica* must survive because the Legislature failed to specifically disapprove it in the new statute or to specifically note such an intention as part of its legislative history. Well established authority supports the conclusion that a change in statutory language can, itself, be an indication of the Legislature's intent. (See *O'Brien v. Dudenhoeffer*, *supra*, 16 Cal.App.4th 327, 335, and cases cited therein; see also *Benson*,

---

[7] Under the HCA, an insurer was required to " 'deposit' " a " 'policy of insurance' " with the PUC as proof of a trucker's financial responsibility (Pub. Util. Code, former § 3632), though with the PUC's consent the insurer could file a certificate of insurance "in lieu of the policy" (*Transamerica*, *supra*, 12 Cal.4th at p. 408 (dis. opn. of Baxter, J., citing Pub. Util. Code, former § 3633). Under the Act, an insurer need only file a certificate of insurance to prove a motor carrier's financial responsibility. (§ 34631.5, subd. (b)(1).)

*supra*, 170 Cal.App.4th at p. 1557.)  Finally, that the Legislature
sought to avoid federal preemption does not mean it did not act
with other purposes in mind as well.

Allied's final argument is that, if we adopt United's
"position that the expiration of a policy eliminates the insurance
company's obligation under the policy despite [the] lack of notice
to the DMV," then "the entire system of financial responsibility
for motor carriers [will] be eviscerated."  The argument, though
a bit hyperbolical, is related to a policy argument we raised in
*Transamerica.*  There, we stated the "certificate of insurance
that an insurance company files with the PUC serves as proof of
a highway carrier's adequate protection against liability . . . .
[A] long-term PUC employee testified at trial that the PUC looks
to the certificate as proof of a highway carrier's compliance with
the financial responsibility obligations imposed by the statutory
scheme:  When a certificate for a policy of insurance is on file,
the PUC assumes that the policy is still in effect, thus providing
coverage for the highway carrier.  [¶]  In addition to providing
an efficient means for the PUC to administer the [HCA's]
financial responsibility requirements . . . , the certificate of
insurance on file with the PUC serves as assurance that the
public is protected in the event of an accident involving a
particular highway carrier." (*Transamerica*, *supra*, 12 Cal.4th
at p. 403.)  Allied contends that, if we hold that an insurance
policy subject to the Act can be canceled without notice to the
DMV, then the public will be left unprotected if a motor carrier

without insurance, but with an active certificate of insurance representing an expired policy, is involved in an accident.[8]

It is true that commercial trucking is a business affecting the public interest and that one goal of the regulating legislation is to ensure that truckers do not improperly seek to reduce costs by carrying inadequate insurance. (*Transamerica, supra,* 12 Cal.4th at p. 397.) *Transamerica* reasoned that, as between an insurer who failed to properly notify the PUC of a policy's expiration and a member of the public injured by an inadequately insured trucker, the insurer should bear the risk of loss. (*Id.* at pp. 403−404.) The Act's legislative history indicates that it was also intended to "enhance public safety." (See, e.g., Sen. Com. on Energy, Utilities and Communications, analysis of Assem. Bill. No. 1683 (1995–1996 Reg. Sess.) as amended July 7, 1996, p. 2.) However, the extension of *insurance coverage* beyond the underlying policy's expiration date is not the only way to achieve these public protection goals.

As discussed above, further litigation or legislative action may clarify the particulars of how the overall statutory scheme will operate to protect the public. That important policy question need not be resolved here. The certified question arises only in the context of claims for equitable contribution and subrogation between two insurance companies. It bears repeating that the plaintiffs in the underlying lawsuit were compensated to the full limits of Allied's policy under the terms

---

[8]     We conclude that a policy can be cancelled even if the corresponding certificate of insurance remains on file. Accordingly, we need not consider whether a subsequent, and properly filed, certificate of insurance supersedes the vitality of any previously filed certificate relating to the same policy.

of their settlement and that, at all relevant times, Porras properly maintained an active operating permit.

## III.   CONCLUSION

Under the Act, a commercial automobile insurance policy does not continue in full force and effect until the insurer cancels a corresponding certificate of insurance on file with the DMV. The duration of the policy's coverage is regulated by its terms and those of any endorsement or amendment to the policy itself.


**CORRIGAN, J.**


**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Allied Premier Insurance v. United Financial Casualty Company

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**  XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S267746
**Date Filed:**  July 24, 2023

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Patrick Howe Law, Patrick M. Howe; Horvitz & Levy, Lisa Perrochet and Peder K. Batalden for Defendant and Appellant.

Booth, Hillary Arrow Booth and Ian P. Culver for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peder K. Batalden
Horvitz & Levy LLP
3601 West Olive Avenue, 8th Floor
Burbank, CA 91505
(818) 995-0800

Hillary Arrow Booth
Booth LLP
11835 West Olympic Boulevard, Suite 600E
Los Angeles, CA 90064
(310) 641-1800